PRECEDENTIAL

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

———————

No. 08-4123

———————

DEUTSCHER TENNIS BUND,
German Tennis Federation;
ROTHENBAUM SPORTS GMBH;
QATAR TENNIS FEDERATION,
                              Appellants

v.

ATP TOUR, INC.; ETIENNE DE VILLIERS;
CHARLES PASARELL; GRAHAM PEARCE;
JACCO ELTINGH; PERRY ROGERS;
IGGY JOVANOVIC;
JOHN DOE 7; JOHN DOE 8; JOHN DOE 9

———————

On Appeal from the United States District Court
for the District of Delaware
D.C. Civil Action No. 07-cv-00178
(Honorable Gregory M. Sleet)

———————

Argued November 2, 2009

Before: SCIRICA, JORDAN and
GREENBERG, *Circuit Judges*.

(Filed: June 25, 2010)

ROBERT D. MacGILL, ESQUIRE (ARGUED)
PETER J. RUSTHOVEN, ESQUIRE
STANLEY C. FICKLE, ESQUIRE
HAMISH S. COHEN, ESQUIRE
MATTHEW B. BARR, ESQUIRE
Barnes and Thornburg
11 South Meridian Street
Indianapolis, Indiana 46204

C. BARR FLINN, ESQUIRE
KAREN E. KELLER, ESQUIRE
Young Conaway Stargatt & Taylor
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
        Attorneys for Appellants

BRADLEY I. RUSKIN, ESQUIRE (ARGUED)
JENNIFER R. SCULLION, ESQUIRE
COLIN A. UNDERWOOD, ESQUIRE
ROBERT D. FORBES, ESQUIRE

Proskauer Rose
1585 Broadway
New York, New York 10036

LAWRENCE C. ASHBY, ESQUIRE
CAROLYN S. HAKE, ESQUIRE
TONI-ANN PLATIA, ESQUIRE
PHILIP TRAINER, JR., ESQUIRE
Ashby & Geddes
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
        Attorneys for Appellees

———————

OPINION OF THE COURT

———————

SCIRICA, *Circuit Judge*.

Men's professional tennis is a worldwide enterprise and every year, professional tennis players compete in various tournaments around the world. The principal men's professional tennis events are the four Grand Slams, the Davis Cup, and the ATP Tour, a worldwide professional tennis circuit organized by the Association of Tennis Professionals ("ATP"). This lawsuit arises out of the reorganization of the ATP Tour—known as the Brave New World plan—designed to revitalize its popularity,

3

enabling it to better compete with other sports and entertainment events. The redesigned format channeled more top-tier players to the top-tier ATP tournaments and also redesignated the tier categories of some tournaments. The changes included a downgrade of the Hamburg, Germany tournament from the first tier to second tier status.

Dissatisfied with the downgrade, Hamburg tournament owners, the German and Qatar Tennis Federations (the "Federations"), sued ATP and certain of its officers and directors. The suit alleged that the Brave New World plan violated §§ 1 and 2 of the Sherman Act and that ATP's Directors breached fiduciary duties owed to the Federations. At trial, the District Court granted ATP's motions for judgment as a matter of law, dismissing the personal liability claims against the Directors for alleged antitrust violations and breach of fiduciary duty. The antitrust claims against ATP were submitted to a jury, which returned a verdict for ATP. The jury found the Federations failed to prove ATP entered into a contract, combination, or conspiracy with any separate entity under § 1 of the Sherman Act, and did not establish a relevant product market under § 2.

The Federations appeal the jury verdict on § 1 of the Sherman Act, asserting the District Court erred in instructing the jury on a "single entity or enterprise defense," and in failing to instruct on the "quick look" mode of analysis. The Federations also appeal the judgment as a matter of law dismissing the antitrust claims against the Directors and the breach of duty of

4

loyalty claim against Director Charles Pasarell. We will affirm the jury verdict on the Sherman Act § 1 claim based on the Federations' failure to prove the relevant market. Consequently, the question of personal director liability for antitrust claims is moot. We also will affirm the judgment as a matter of law dismissing the breach of duty of loyalty claim against Director Pasarell because neither he individually nor the ATP Board of Directors as a whole were materially self-interested when they voted in favor of the Brave New World plan.

## I.

## A.

Initially an association of the world's top men's professional tennis players, ATP evolved into a non-profit corporation consisting of a membership of men's professional tennis players and organizers of men's professional tennis tournaments. ATP operates a worldwide tennis tour composed of the member tournaments, culminating in ATP's end-of-season championship tournament, the Tennis Masters Cup.[1] Tennis players earn prize money and ATP ranking points through playing in ATP tournaments.

ATP ranking points determine each player's world ranking. The player rankings are important because they govern

---

[1]In 2009, the Tennis Masters Cup was replaced by the Barclays ATP World Tour Finals.

5

entry into and seeding in the Grand Slams[2] as well as ATP top-tier tournaments—the most important professional tennis tournaments. In turn, these tournaments award the most prize money and ranking points.

ATP tournament members are divided into three categories: (1) Tier I (formerly "Masters Series"); (2) Tier II (formerly "International Series Gold"); (3) Tier III (formerly "International Series"). The categories of tournaments are distinguished by different levels of minimum prize money and

---

[2]The four Grand Slams (Australian Open, French Open, Wimbledon, and US Open) and the Davis Cup are not ATP tournaments and are regulated by the International Tennis Federation ("ITF"). But the Grand Slams have agreed to use ATP entry and ranking systems as the basis for determining entry and seeding of men's professional players into their events (Wimbledon has its own method of seeding calculation, which also takes into account players' past performances on grass over the previous two years, as well as their ATP ranking). In return, playing in the Grand Slams is mandatory for top ATP players. The Grand Slams also agreed not to organize a year-end event competing with the ATP's Tennis Masters Cup and ATP agreed not to combine the Masters Cup with the Women's Tennis Association's year-end event. Additionally, ATP has an agreement with ITF not to schedule ATP events against Davis Cup matches and to award ATP ranking points to Davis Cup tournaments.

different amounts of ranking points awarded on the basis of performance.

ATP is governed by a seven-member Board of Directors—three elected by tournament members (representing different geographic regions), three elected by player members, and a Chairman/President. ATP's Bylaws give the ATP Board discretion over the Tour's format.

In 2007, the Board voted to adopt several changes to the ATP Tour. According to ATP, this restructuring was necessitated by market changes and conditions: ATP was losing ground in the sports and entertainment markets. ATP's market research revealed that tennis fans wanted to see the top tennis players play against each other more often. ATP perceived that a growing decline in player participation in its top-tier events undermined its prestige and also the profile of the sport, leading to a decline in ticket sales and weakening the member tournaments' ability to secure television coverage and sponsorships. By strengthening its top-tier events and simplifying its tournament structure, ATP believed it could better compete with other sports events and other forms of entertainment, and also award more prize money to the players.

The Brave New World plan's objective was to increase the value and appeal of top-tier tournaments by channeling top players to compete in them. It also aimed to make the progression of the Tour easier for fans to follow by clearly communicating each tournament's tier and differentiating

between the different tiers. To achieve these goals, the Brave New World plan altered the number of ranking points awarded to winning players in different tiers of tournaments. Tier I tournaments would award 1000 points instead of 500; Tier II tournaments would award 500 points instead of a range between 250 and 300; Tier III tournaments would award 250 points instead of a range between 175 and 250. Additionally, the Brave New World plan renamed the tournament tiers to correspond to the new ranking points system: Tier I became the "ATP World Tour Masters 1000"; Tier II became the "ATP World Tour 500"; and Tier III became the "ATP World Tour 250." The new ranking point distribution was designed in part as an incentive for the top tennis players to play the ATP top-tier events.

The Brave New World plan also reconfigured the Tour calendar to create geographic "swings" or "seasons" around the Grand Slams because of their size, prestige, history, and popularity, and their significantly greater amount of prize money. Thus, the Brave New World plan scheduled the top-tier ATP tournaments in the weeks before the Grand Slams with corresponding court surfaces—e.g., the Tier I tournament in Madrid, Spain on a clay surface was scheduled in the weeks before the French Open, a Grand Slam tournament also on clay. According to ATP, scheduling their tournaments in this way attracts the top tennis players because of their desire to play on the same surface as the upcoming Grand Slam tournaments.

Notably, the Brave New World plan also amended ATP

8

rules so that qualifying players were required, under threat of sanctions—suspension, loss of ranking, and loss of ability to earn ranking points—to play all Tier I events, at least four Tier II events, and at least two Tier III events. Further, all qualifying players were also required to play in the year-end Tennis Masters Cup championship. In addition, the Brave New World plan imposed a "Special Events" rule on the top 50 players, prohibiting them from participating in any non-ATP, non-Grand Slam events during the weeks of and surrounding ATP events. As noted, these changes were prompted by the decline in top player participation in ATP tournaments. In turn, ATP increased the tournaments' minimum prize money levels to benefit the players.

The Brave New World plan also spurred significant capital investments in facilities on the part of the tournaments—the Tier I and Tier II tournaments committed to approximately $864 million in capital investments. ATP undertook to create a more unified branding approach for the Tour and increased spending on promotion and marketing. It projected a $9 million marketing amount for 2009; previous budgets provided for only $800,000 in 2005 and 2006, and $5 million in 2007 and 2008. It also enhanced pooling for existing broadcast and digital media rights.

In sum, ATP designed the Brave New World plan as a comprehensive plan to address the perceived decline of ATP in the sports and entertainment markets. Concluding that fans desired a better structured Tour, featuring the best players

playing against each other more often, ATP decided to simplify the Tour's format and to introduce regulations ensuring top player participation in ATP top-tier tournaments. Both ATP and the member tournaments committed to make investments to improve the quality of the Tour and promote it more effectively. The tournament members agreed to increase the prize money levels to compensate the players for agreeing to play in more top-tier events.

**B.**

Plaintiff German Tennis Federation promotes tennis in Germany and claims to be the world's largest national tennis federation, with approximately 1.7 million members. It stages an annual clay-court tournament in Hamburg, Germany. From 1990 to 2009, Hamburg tournament was a Tier I ATP tournament. Under the Brave New World plan, the Hamburg tournament was demoted to Tier II. The overall number of Tier I events remained at nine, with the addition of Shanghai, China.[3] In Tier II, the number of events was increased from nine to eleven. Plaintiff Qatar Tennis Federation was established in Qatar and has owned and operated a Tier III tournament in Doha, Qatar. It also owns a 25% stake in Hamburg tournament.

---

[3] The Federations contend that initially the Brave New World plan downgraded the Monte Carlo tournament to Tier II. But after Monte Carlo sued ATP, the parties settled with Monte Carlo having a hybrid status—it awards 1,000 ranking points but is not a mandatory tournament for players.

ATP contends the Hamburg tournament was demoted to Tier II because of its lack of significant investment, a decrease in attendance, unfavorable weather, and the decline of interest in tennis in Germany. ATP asserts that Hamburg tournament can succeed as a Tier II tournament.

## C.

The Federations sued ATP alleging its adoption of the Brave New World plan violated §§ 1 and 2 of the Sherman Act and constituted a breach of the directors' fiduciary duties. The § 1 claim contended defendants conspired and combined to control the supply of top men's professional tennis players' services, establishing a favored class of tournaments in which top-player participation was mandatory, while precluding other tournaments from competing for such player services. Similarly, the § 2 claim alleged monopolization, attempt to monopolize, and conspiracy to monopolize the market for men's professional tennis players' services. Plaintiffs also asserted the ATP directors' adoption of the Brave New World plan breached their fiduciary duties of due care, loyalty, and good faith owed to the Federations.

The case was tried to a jury. At the close of the Federations' case, the District Court granted ATP's Fed. R. Civ. P. 50(a) motions for judgment as a matter of law on all claims of personal liability against the Directors for alleged antitrust violations and breach of fiduciary duties. The court held that personal civil liability for antitrust violations is limited to

11

participation in inherently unlawful acts. The court reasoned that under antitrust law, only *per se* violations are inherently unlawful. Finding that the alleged conduct could not be classified as classic *per se* violations, the court concluded that individual directors could not be liable. Addressing the breach of fiduciary duty claims against the Directors, it found the Federations failed to satisfy their initial burden of rebutting the presumption of the business judgment rule by showing the Directors violated any of their fiduciary duties. Accordingly, the District Court granted defendants' motion for judgment as a matter of law and dismissed all claims against the individual Directors.

The court then addressed proposed jury instructions. ATP submitted a proposed instruction on the "single entity or enterprise defense," stating that where entities "are commonly controlled or substantially integrated in their operations, they may be considered a 'single entity' or 'single enterprise' under the antitrust laws." The Federations objected, arguing that the instruction misstated the law and created a significant risk of confusion. Overruling the Federations' objections, the District Court gave the "single entity or enterprise defense" jury instruction as proposed by ATP. The court also considered whether the alleged restraints should be analyzed under "quick look" or the full rule of reason analysis. The court instructed the jury on the latter.

The jury returned a verdict for ATP on all claims. On the Sherman Act § 1 claim, it found the Federations did not prove

ATP "entered into contract(s), combination(s) or conspiracy(ies) with any separate entity or entities." And on the Sherman Act § 2 claim, it found the Federations did not establish "the existence of any relevant product market(s) within any geographic market(s)."

The Federations filed a timely appeal of the Sherman Act § 1 claim against ATP and the Directors and the breach of fiduciary duty of loyalty claim against Director Charles Pasarell. Specifically, they contend the District Court erred by instructing the jury on the single entity defense, refusing to instruct the jury to apply "quick look" analysis, and granting defendants' motion for judgment as a matter of law on all claims against the individual Directors.[4]

## II.

## A.

Even assuming, *arguendo*, that the District Court erred in instructing the jury on the single entity defense, the Federations could not have succeeded on their Sherman Act § 1 claim because they failed to prove "the existence of any relevant

---

[4]The District Court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 based on claims alleged under Sherman Act, 15 U.S.C. §§ 1, 2 and 26, and under 28 U.S.C. § 1367 for supplemental state law claims. We have appellate jurisdiction under 28 U.S.C. § 1291.

13

product market(s) within any geographic market(s)."[5]  On the § 1 claim, the jury found no concerted action, so it did not reach the issue of relevant market.  But on the Sherman Act § 2 claim, the jury did find the Federations failed to prove the existence of a relevant market.

The Federations contend that market definition and proof under § 2 differ from those under § 1, arguing that insufficient § 2 market proof does not establish insufficiency under § 1.  In *Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum & Chem. Corp.*, 579 F.2d 20 (3d Cir. 1978), we said that "inquiries into the scope of competition under § 1 and § 2 are not precisely the same."  *Id.* at 27 n.11.  But in this case, the Federations asserted identical market definitions under §§ 1 and 2, as evidenced by the jury instructions.[6]  *Cf. Tunis Bros. Co., Inc. v. Ford Motor*

---

[5]Because the Federations did not carry their burden of proving a relevant market, we do not need to decide whether the District Court's single entity instruction was given in error.  *See infra* Part III.

[6]Giving the jury an overview of the rule of reason analysis for the purposes of § 1, the court stated: "[Y]ou must first determine whether Plaintiffs have carried their burden to show that any challenged restraint has resulted or is likely to result in a substantial harm to competition in a relevant product or geographic market(s)."  App. 257 (Antitrust Jury Instruction 10—Antitrust Claims: Sherman Act Section 1—Rule of

14

Reason–Overview). Explaining the requirement of proof of competitive harm, the court repeated: "[I]t is Plaintiffs' burden to show that the harm to competition occurred in an identified market, known as a 'relevant market.' There are two aspects to a relevant market. The first aspect is known as the relevant product market. The second aspect is known as the relevant geographic market." *Id.* at 258 (Antitrust Jury Instruction 11—Antitrust Claims: Sherman Act Section 1—Rule of Reason–Proof of Competitive Harm). Closely following the Model Jury Instructions, the court then instructed the jury on the substance of the relevant market inquiry. *Id.* at 261 (Antitrust Jury Instruction 13—Rule of Reason–Proof of Relevant Market). Later, describing the elements of the monopolization claim under § 2, the court explained: "Plaintiffs must prove by a preponderance of the evidence that the defendants had monopoly power in a relevant market." *Id.* at 272 (Antitrust Jury Instruction 21—Monopolization: Relevant Market–General). Using the nearly identical language as for the rule of reason instructions, the court continued: "There are two aspects you must consider in determining whether plaintiff has met its burden to prove the relevant market by a preponderance of the evidence. The first is the relevant product market; the second is the relevant geographic market." *Id.* No relevant market inquiry instructions specific to § 2 claims were proposed or provided. *See also* ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases A-6 (2005) (suggesting

*Co.*, 952 F.2d 715, 724 n.3 (3d Cir. 1991) ("On this record, however, the plaintiffs do not present a sufficiently close factual issue to demarcate a distinction between product market definitions in section 1 and section 2 cases . . . ."). The jury verdict forms posed the same question regarding proof of the relevant market for the purposes of §§ 1 and 2 claims: "Have Plaintiffs proven by a preponderance of the evidence the existence of a relevant product market within a relevant geographic market?" App. 5, 10, 14, 18. Therefore, the jury's conclusion that the Federations failed to prove a relevant market under § 2 is equally applicable to § 1 analysis. *See Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 59–61 (1st Cir. 2002) (affirming the judgment on § 1 claims based on the jury finding that plaintiffs failed to establish a relevant market under § 2).

**B.**

The Federations also contend they did not need to prove a relevant market because the District Court should have instructed the jury to conduct a "quick look" analysis, which does not require detailed market analysis. The Federations proposed a "quick look" jury instruction that the alleged restraints caused substantial harm to competition as a matter of law, so that the jury needed only consider "whether the restraint

---

that the instruction describing the relevant market for the purposes of § 1 claim incorporate the § 2 relevant market instructions).

16

produces countervailing competitive benefits," and if so, "balance the competitive harm against the competitive benefit." App. 451. But the District Court reasoned that "[t]he evidence [presented] could perhaps be evidence of . . . antitrust violations, but only after one engaged in a detailed examination of the industry in question, and furthermore, only after taking the industry in question to be top-tier men's professional tennis, rather than, for example, professional sports or spectator events more generally." *Id.* at 25. The court concluded that "the plaintiffs failed to show evidence [of acts] that have no purpose except to stifle competition . . . ." *Id.* Accordingly, the court required the jury to analyze the alleged restraint under full rule of reason principles and rejected the proposed "quick look" instruction.[7] Because even beneficial legitimate contracts or combinations restrain trade to some degree, § 1 of the Sherman Act has long been interpreted to prohibit only those contracts or combinations that are "unreasonably restrictive of competitive conditions." *Standard Oil Co. v. United States*, 221 U.S. 1, 58 (1911). Historically, "[t]hree general standards have emerged for determining whether a business combination unreasonably restraints trade under [§ 1]." *United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993).

"Most restraints are analyzed under the traditional 'rule

[7]The selection of a mode of antitrust analysis is a question of law over which we exercise plenary review. *See Arizona v. Maricopa County Med. Soc'y.*, 457 U.S. 332, 337 n.3 (1982)).

17

of reason.'" *Id.* (citing *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977)); *see also Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) ("[T]his Court presumptively applies rule of reason analysis . . . ."); *State Oil v. Khan*, 522 U.S. 3, 10 (1997). "The rule of reason requires the fact-finder to 'weigh [] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Brown*, 5 F.3d at 668 (quoting *GTE Sylvania*, 433 U.S. at 49). The inquiry is whether the restraint at issue "is one that promotes competition or one that suppresses competition." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 691 (1978). "The plaintiff bears an initial burden under the rule of reason of showing that the alleged combination or agreement produced adverse, anti-competitive effects within the relevant product and geographic markets." *Brown*, 5 F.3d at 668. "The plaintiff may satisfy this burden by proving the existence of actual anticompetitive effects," or defendant's market power. *Id.* "If a plaintiff meets his initial burden of adducing adequate evidence of market power or actual anti-competitive effects, the burden shifts to the defendant to show that the challenged conduct promotes a sufficiently pro-competitive objective." *Id.* at 669. "To rebut, the plaintiff must demonstrate that the restraint is not reasonably necessary to achieve the stated objective." *Id.*

Some categories of restraints, such as horizontal price-fixing and market allocation agreements among competitors, "because of their pernicious effect on competition and lack of

18

any redeeming virtue are conclusively presumed to be unreasonable." *Id.* (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)). "Such 'plainly anticompetitive' agreements or practices are deemed to be 'illegal *per se*,'" *id.* (quoting *Prof'l Eng'rs*, 435 U.S. at 692), without an "elaborate inquiry into the reasonableness of a challenged business practice," *id.* (quoting *Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 343 (1982)). "*Per se* liability is reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'" *Dagher*, 547 U.S. at 5 (quoting *Prof'l Eng'rs*, 435 U.S. at 692); *see also State Oil Co.*, 522 U.S. at 10 ("*Per se* treatment is appropriate '[o]nce experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it.'" (quoting *Maricopa County Med. Soc'y*, 457 U.S. at 344)). Accordingly, the courts are reluctant "to adopt *per se* rules . . . where the economic impact of certain practices is not immediately obvious." *State Oil Co.*, 522 U.S. at 10 (internal quotation marks omitted).

"In addition to the traditional rule of reason and the *per se* rule, courts sometimes apply what amounts to abbreviated or 'quick look' rule of reason analysis." *Brown*, 5 F.3d at 669; *see NCAA v. Bd. of Regents*, 468 U.S. 85, 109 n.39. It is "an intermediate standard" and "applies in cases where *per se* condemnation is inappropriate but where no elaborate industry analysis is required to demonstrate the anticompetitve character of an inherently suspect restraint." *Brown*, 5 F.3d at 669

(internal quotation marks omitted); *see FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986); *NCAA*, 468 U.S. at 109 (1984); *Prof'l Eng'rs*, 435 U.S. at 692. In such cases, "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999). In other words, "quick-look analysis carries the day when the great likelihood of anticompetitive effects can easily be ascertained." *Id.* Under "quick look" analysis, the competitive harm is presumed, and "the defendant must promulgate 'some competitive justification' for the restraint." *Brown*, 5 F.3d at 669 (quoting *NCAA*, 468 U.S. at 110). "If no legitimate justifications are set forth, the presumption of adverse competitive impact prevails and 'the court condemns the practice without ado.'" *Id.* (quoting *Chicago Prof'l Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 674 (7th Cir. 1992)). "If the defendant offers sound pro-competitive justifications, however, the court must proceed to weigh the overall reasonableness of the restraint using a full-scale rule of reason analysis." *Id.*

"[T]here is often no bright line separating" the different modes of analysis. *NCAA*, 468 U.S. at 104 n.26. "'There is always something of a sliding scale in appraising reasonableness, but the sliding scale formula deceptively suggests greater precision than we can hope for. . . . Nevertheless, the quality of proof required should vary with the circumstances.'" *Cal. Dental*, 526 U.S. at 779 (quoting Philip

20

E. Areeda, *Antitrust Law* ¶ 1507, at 402 (1986)). "[The] categories of analysis of anticompetitive effect are less fixed than terms like '*per se*,' 'quick look,' and 'rule of reason' tend to make them appear." *Id.* Regardless of the standard used, the purpose of the inquiry is always to assess the effect of the conduct on competition: "Whether the ultimate finding is the product of a presumption or actual market analysis, the essential inquiry remains the same—whether or not the challenged restraint enhances competition." *NCAA*, 468 U.S. at 104. As the Supreme Court summarized:

> [T]here is generally no categorical line to be drawn between restraints that give rise to an intuitively obvious inference of anticompetitive effect and those that call for more detailed treatment. What is required, rather, is an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint. The object is to see whether the experience of the market has been so clear, or necessarily will be, that a confident conclusion about the principal tendency of a restriction will follow from a quick (or at least quicker) look, in place of a more sedulous one.

*Cal. Dental*, 526 U.S. at 780–781. Thus, the three modes of analysis should be viewed as a single inquiry that, depending on the circumstances, may sometimes be conducted by applying various presumptions. *See generally* 7 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1511, at 418 (2d ed.

21

2000).

## C.

The Federations contend that the Brave New World plan "allocates and divides the player services market among horizontal competitors" and "[t]his obviates competition among favored tournaments for the player services vital for success, while making it impossible for other tournaments . . . to compete for such services." Appellant's Br. 48. The Federations allege an output-limiting horizontal restraint. Nevertheless, the *per se* rule does not apply because for a tennis tour, like other sports leagues, "horizontal restraints on competition are essential if the product is to be available at all." *NCAA*, 468 U.S. at 101; *see also Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979) (rejecting *per se* treatment "where the agreement on price is necessary to market the product at all"); *Worldwide Basketball & Sports Tours, Inc. v. NCAA*, 388 F.3d 955, 959 (6th Cir. 2004) ("Because there is no doubt that horizontal restraints are necessary to make the kind of league competition at issue available, the rule of reason applies."); *Law v. NCAA*, 134 F.3d 1010, 1019 (10th Cir. 1998) ("[C]ourts consistently have analyzed challenged conduct under the rule of reason when dealing with an industry in which some horizontal restraints are necessary for the availability of a product . . . .").

Under "quick look," the rationale for presuming competitive harm without detailed market analysis is that the anticompetitive effects on markets and consumers are obvious.

22

*Cal. Dental*, 526 U.S. at 770. Although the Federations contended the Brave New World Plan restrained the "top player services" market, the definition of the relevant market was one of the most contested issues at trial—so much so that after all the evidence was presented the District Court saw the bounds of the relevant market as "ambiguous." App. 25. Because "the contours of the market" here are not "sufficiently well known or defined to permit the court to ascertain without the aid of extensive market analysis whether the challenged practice impairs competition," "quick look" is not appropriate and proof of relevant market is required under full-scale rule of reason. *Worldwide Basketball & Sports Tours*, 388 F.3d at 961.

Further, even where anticompetitive effects are obvious, "quick look" condemnation is proper only after assessing and rejecting the logic of proffered procompetitive justifications. *Cal. Dental*, 526 U.S. at 771; *see N. Tex. Speciality Physicians v. FTC*, 528 F.3d 346, 362 (5th Cir. 2008). Although competitive harm is initially presumed under "quick look," "[i]f the defendant offers sound procompetitive justifications, . . . the court must proceed to weigh the overall reasonableness of the restraint using a full-scale rule of reason analysis." *Brown*, 5 F.3d at 669; *see also Cal. Dental*, 526 U.S. 756, 771 (1999) (holding that full rule of reason analysis was required where challenged restraint "might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition"); *Bogan v. Hodgkins*, 166 F.3d 509, 514 n.6 (2d Cir. 1999) (observing that courts must apply the full rule of

23

reason once defendant has introduced "sound allegations of procompetitive benefit"). Where procompetitive justifications are proffered, their logic must be assessed and rejected in order to avoid reverting to full-scale rule of reason analysis. "[T]he burden remains on the challenger to demonstrate that the proffered procompetitive effect does not plausibly result in 'a net procompetitive effect, or possibly no effect at all on competition.'" *N. Tex. Speciality Physicians*, 528 F.3d at 362 (quoting *Cal. Dental*, 526 U.S. at 771). "If, after examining the competing claims of anti- and procompetitive effects, it remains plausible that the net effect is procompetitive or that there is no effect on competition, then "[t]he obvious anticompetitive effect that triggers abbreviated analysis has not been shown." *Id.* (quoting *Cal. Dental*, 526 U.S. at 778); *see also* 11 Areeda & Hovenkamp*, supra*, ¶ 1911c, at 305 (2d ed. 2005) (explaining that when defendant offers preliminary evidence suggesting that the challenged restraint is justified, and the court finds such evidence plausible, the restraint must be "subjected to general rule of reason analysis requiring full consideration of power and anticompetitive effects").

ATP proffered evidence of procompetitive justifications for the Brave New World plan. The plan was developed to make the ATP Tour more competitive with other spectator sports and entertainment products by improving the quality and consistency of its top-tier events. The modifications to the tour calendar, increase of investment, higher payments to players, and expanded geographic reach were all designed to improve the

24

Tour. Such rules and regulations can be procompetitive where they enhance the "character and quality of the 'product.'" *NCAA*, 468 U.S. at 102.

In fact, the Federations seem to concede that ATP offered procompetitive justifications. But they would have the jury balance the proffered procompetitive justification against the presumed anticompetitive harm. They argue that under "quick look," the jury's inquiry "starts from the premise—already determined by the court as a matter of law—that the restraint's anticompetitive effect is evident without need for detailed market analysis, requiring no proof by plaintiff of market definition or power." Appellant's Reply Br. 7. The Federations misapprehend the reasonableness analysis. Once a defendant comes forward with plausible procompetitive justification for the challenged restraint, the "quick look" presumption disappears and the overall reasonableness of the restraint is assessed using a full-scale rule of reason analysis. *Brown*, 5 F.3d at 669. "The application of the quick look analysis is a question of law to be determined by the court," and therefore the concept of "quick look" has no application to jury inquiry. ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases A-8 n.2 (2005). The jury was properly instructed to analyze the alleged restraints under the rule of reason, and their finding that the Federations failed to prove the

25

relevant market defeats the Sherman Act § 1 claim.[8]

---

[8]The Federations also appeal the District Court's grant of judgment as a matter of law on all antitrust liability claims against individual ATP directors. Relying on *Murphy Tugboat Co. v. Shipowners & Merchs. Towboat Co.*, 467 F. Supp. 841 (N.D. Cal. 1979), *aff'd sub nom. Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256 (9th Cir. 1981), the District Court held "that civil liability for antitrust violations is limited to participation in inherently unlawful acts, that is, [] per se violation[s] of antitrust law." App. 24. It concluded that "the evidence [in this case] shows the individuals' conduct was not the type of inherently wrongful activity that gives rise to personal liability under antitrust law," but "seem[s] within or at least bordering that gray area of socially acceptable economically justifiable business conduct that the law, in fact, permits." *Id.* at 25.

The Federations argue that the District Court's limitation of directors' personal liability to *per se* antitrust violations is legally incorrect. We question the persuasive value of *Murphy Tugboat. See, e.g., Monarch Mktg. Sys., Inc. v. Duncan Parking Meter Maint. Co.*, No. 82 C 2599, 1986 WL 3625, at *2 (N.D. Ill. Mar. 13, 1986); Gregory Walker, Note, *The Personal Liability of Corporate Officers in Private Actions Under the Sherman Act:* Murphy Boat *in Distress*, 55 Fordham L. Rev. 909 (1987) (criticizing *Murphy Tugboat* approach to corporate officers' personal liability for antitrust violations). But we need

26

## III.

### A.

On the Sherman Act § 1 claim, the jury also found the Federations did not prove that ATP entered into "contract(s), combination(s) or conspiracy(ies) with any separate entity or entities." In other words, the jury did not find the requisite concerted action to support a § 1 claim. The Federations assert the jury reached this conclusion based on the "single entity or enterprise defense" instruction, which allowed the jury to find that defendants' actions were undertaken as a single entity, instead of as independent actors. The Federations contend the instruction misstated the law and thus was given in error.[9]

---

not decide whether the District Court erred in imposing a limitation on directors' personal liability and dismissing the antitrust claims against them. Because the Federations could not sustain their antitrust claims and failed to prove an antitrust violation, they would not be able to sustain the same claim against the Directors. Therefore, even assuming the District Court erred in granting summary judgment on the antitrust claims against the directors, plaintiffs cannot prevail on these claims.

[9]"We exercise plenary review to determine whether jury instructions misstated the applicable law . . . ." *Cooper Distrib. Co. v. Amana Refrigeration., Inc.*, 180 F.3d 542, 549 (3d Cir. 1999).

27

To prevail under § 1 of the Sherman Act, a plaintiff must first establish a "contract, combination . . . or conspiracy." Section 1 applies only to concerted action and does not proscribe independent action by a single entity, regardless of its purpose and effect on competition. *Am. Needle, Inc. v. NFL*, No. 08-661, 2010 WL 2025207, at *5 (U.S. May 24, 2010); *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984).[10]

Under *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), in certain cases, distinct legal entities are incapable of concerted action for the purposes of § 1 and must be viewed as a single entity.[11] Although *Copperweld* did not set

---

[10]Independent action by a single entity can still be scrutinized under § 2 of the Sherman Act. *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 205 (3d Cir. 1992).

[11]In *Copperweld*, the Supreme Court held that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act." 467 U.S. at 771. The Court reasoned that § 1 scrutiny is not justified because "[a] parent and its wholly owned subsidiary have a complete unity of interest," and when they agree to a course of action, "there is no sudden joining of economic resources that had previously served different interests." *Id.* The antitrust laws treat concerted behavior more strictly than unilateral behavior because "[c]oncerted activity inherently is fraught with anticompetitive risk." *Id.* at 768-69.

28

clear parameters for what constitutes a single economic entity beyond the parent-subsidiary context, "it nonetheless encouraged the courts to analyze the substance, not the form, of economic arrangements."[12] *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1132 (3d Cir. 1995); *see Am. Needle*, 2010 WL 2025207, at *8 ("As *Copperweld* exemplifies, 'substance, not form, should determine whether a[n] . . . entity is capable of conspiring under § 1.'" (quoting *Copperweld*, 467 U.S. at 773 n.21)). Courts have applied the single-entity concept to joint ventures of separately owned entities. In determining

---

Concerted action "deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands." *Id.* at 769. But although parent and wholly owned subsidiaries are distinct corporate entities and independent legal persons, they nevertheless compose a single economic entity for antitrust scrutiny because "[t]hey share a common purpose," *id.* at 771. Since they always have a "unity of purpose or a common design," *id.*, they are "incapable of conspiring with each other for purposes of § 1 of the Sherman Act," *id.* at 777.

[12]Courts have extended *Copperweld* to situations involving sibling-subsidiaries of the same parent corporation, *see Eichorn v. AT&T Corp.*, 248 F.3d 131 (3d Cir. 2001), subsidiaries owned by the same co-owners who maintained control over them, *see Century Oil Tool, Inc. v. Prod. Specialties*, 737 F.2d 1316 (5th Cir. 1984), and franchisors and franchisees, *see Williams v. I.B. Fischer Nev.*, 999 F.2d 445 (9th Cir. 1993).

29

whether *Copperweld* applies to joint ventures, courts have focused primarily on whether the venture "bring[s] together the economic power of actors which were previously pursuing divergent interests and goals."[13] *Siegel Transfer*, 54 F.3d at 1137. "The key is whether the alleged 'contract, combination . . . , or conspiracy' is concerted action—that is, whether it joins together separate decisionmakers." *Am. Needle*, 2010 WL 2025207, at *8. "The relevant inquiry, therefore, is whether there is a 'contract, combination . . . or conspiracy' amongst separate economic actors pursuing separate economic interests, such that the agreement deprives the marketplace of independent centers of decisionmaking, and therefore of diversity of entrepreneurial interests, and thus of actual or potential competition." *Id.* (internal quotation marks omitted). Indisputably, joint ventures can be economically beneficial. But "the fact that joint venturers pursue the common interests of the whole is generally not enough, by itself, to render them a single

_____

[13] *See, e.g.*, *Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1035 (9th Cir. 2005) (holding that a national club and its regional affiliates were incapable of conspiring as separate entities because they were not competitors and maintained an economic unity); *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268 (8th Cir. 1988) (holding that a rural electrical cooperative consisting of three tiers of cooperatives with interlocking ownership was a single entity because member cooperatives shared a common goal of providing low-cost electricity).

30

entity." *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1148 (9th Cir. 2003). "[A] commonality of interest exists in every cartel." *Id.* (quoting *L.A. Mem'l Coliseum v. NFL*, 726 F.2d 1381, 1389 (9th Cir. 1984)). The formalities should not detract from the necessity to examine the economic realities of the restraints imposed on competition by a joint venture. *See Am. Needle*, 2010 WL 2025207, at *6 ("[W]e have eschewed such formalistic distinctions in favor of a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate."). The focus of the inquiry under § 1 of the Sherman Act centers on diminution of competition that would otherwise exist. *Id.* at *8. When the agreement joins together independent centers of decisionmaking, "the entities are capable of conspiring under § 1, and the court must decide whether the restraint of trade is an unreasonable and therefore illegal one." *Id.* at *9.

**B.**

At trial, ATP contended it constitutes a single enterprise, and under *Copperweld*, its internal decisions cannot violate § 1 of the Sherman Act. It asserted each of its tournament members is dependent on the others to produce a common product—a marketable annual professional tennis tour that competes with other forms of entertainment, within and without the sports arena. ATP maintained its members do not compete but instead cooperate to produce the Tour, and its adoption of the Brave New World plan was the core activity of producing this product. For their part, the Federations contended ATP operates in the

31

market for top tier men's professional tennis players, and individual tournaments compete to attract top players. They asserted the Brave New World plan was an agreement unreasonably restraining trade in this alleged market. Both parties presented expert testimony. The District Court concluded "there [were] at least underlying facts that [were] critical to" a determination of "whether the ATP and its members function as a single business entity," and that these facts are "beyond [the] Court's purview and in need of attention by a jury." App. 36. Accordingly, the court gave the jury ATP's proposed single enterprise instruction.

## C.

In the context of the professional sports industry, courts have historically subjected sports leagues to antitrust scrutiny under § 1 of the Sherman Act. In *NCAA v. Board of Regents*, 468 U.S. 85 (1984), decided eight days after *Copperweld*, the Supreme Court considered a § 1 challenge to the NCAA's restrictions on member institutions' ability to enter into separate contracts to televise their football games. The Court acknowledged that "a certain degree of cooperation is necessary" to preserve the "type of competition that [the NCAA] and its member institutions seek to market." *Id.* at 117. But the Court concluded that because the challenged plan "prevent[ed] member institutions from competing against each other," they had "created a horizontal restraint—an agreement among competitors on the way in which they will compete with one another." *Id.* at 99. After analyzing the reasonableness of the

32

alleged restraint, the Court held it violated § 1 of the Sherman Act. *Id.* at 120.

Many other courts have resisted single entity arguments involving sports industries.[14] But the Court of Appeals for the

---

[14]*See e.g.*, *NHL Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 470 (6th Cir. 2005) (holding that the hockey league's adoption of a players-eligibility rule was "an agreement between multiple actors"); *Sullivan v. NFL*, 34 F.3d 1091, 1099 (1st Cir.1994) (refusing to hold as a matter of law that the NFL is a single entity under *Copperweld*); *L.A. Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1388–89 (9th Cir. 1984) (rejecting the NFL's argument for single entity treatment because "[w]hile the NFL clubs have certain common purposes . . . NFL policies are not set by one individual or parent corporation, but by the separate teams acting jointly"); *Mid-South Grizzlies v. NFL*, 720 F.2d 772, 778, 787 (3d Cir. 1983) (describing ways in which NFL teams compete with each other); *N. Am. Soccer League v. NFL*, 670 F.2d 1249, 1257–58 (2d Cir. 1982) (refusing to treat the NFL as a single economic entity and exempt it from liability under § 1 of the Sherman Act); *accord Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 71 (2d Cir. 1995) (holding that an association consisting of representatives of national tennis associations, tournament owners and directors, and professional tennis players was a joint venture, consisting of multiple entities, and able to conspire under § 1 of the Sherman Act). *But see Seabury*

33

Seventh Circuit in *Chicago Professional Sports Limited Partnership v. NBA*, 95 F.3d 593 (7th Cir. 1996) ("*Bulls II*"), suggested that a sports league can sometimes be viewed as a single entity for antitrust purposes. *Id.* at 598 ("We see no reason why a sports league *cannot* be treated as a single firm . . . ."). The court concluded that *Copperweld*'s rule is not limited to the circumstances where cooperating parties have a "complete unity of interest." *Id.* Recognizing that whether the NBA "is more like a single firm . . . or like a joint venture . . . is a tough question" because "it has characteristics of both," the court concluded that "the league looks more or less like a firm depending on which facet of the business one examines." *Id.* at 599. "From the perspective of fans and advertisers . . . 'NBA Basketball' is one product from a single source," "[b]ut from the perspective of college basketball players who seek to sell their skills, the teams are distinct," and "the league looks more like a group of firms acting as a monopsony." *Id.* Remanding to the district court for determination of the issue, the court observed: "Sports are sufficiently diverse that it is essential to investigate their organization and ask *Copperweld*'s functional question one

*Mgmt., Inc. v. PGA of Am., Inc.*, 878 F. Supp. 771, 778 (D. Md. 1994) (holding that the PGA could not conspire with its regional sections as a matter of law), *aff'd in relevant part*, 52 F.3d 322 (4th Cir. 1995) (Table); *NFL v. N. Am. Soccer League*, 459 U.S. 1074, 1077 (1982) (Rehnquist J., dissenting from denial of certiorari) (arguing that the NFL is a single entity because it "competes as a unit against other forms of entertainment").

34

league at a time—and perhaps one facet of a league at a time . . . ." *Id.* at 600.

The parties in *Bulls II* settled after the case was remanded, but the Court of Appeals for the Seventh Circuit revisited the issue in *American Needle, Inc. v. NFL*, 538 F.3d 736 (7th Cir. 2008), *rev'd*, 2010 WL 2025207 (U.S. May 24, 2010). Guided by principles enunciated in *Bulls II*, the court affirmed the district court's grant of summary judgment for the NFL on a claim stemming from its practice of centralized licensing of intellectual property. *Id.* at 744 (concluding "the NFL teams are best described as a single source of economic power when promoting NFL football though licensing the teams' intellectual property"). But the Supreme Court reversed, finding the court's reasoning unpersuasive. 2010 WL 2025207, at *10. The Court observed that each of the teams in the NFL is a "substantial, independently owned, and independently managed business." *Id.* at *9. The Court further noted the NFL teams "compete with one another, not only on the playing field, but to attract fans, for gate receipts and for contracts with managerial and playing personnel." *Id.* Specifically relevant to the case, the Court found "the teams compete in the market for intellectual property." *Id.* at *9. Therefore, the Court concluded "[d]ecisions by NFL teams to license their separately owned trademarks collectively and to only one vendor are decisions 'that depriv[e] the marketplace of independent centers of decisionmaking,' and therefore of actual or potential competition." *Id.* (quoting *Copperweld*, 467 U.S. at 770).

35

Similarly, the agreement among the ATP's tournament members in the Brave New World Plan might have deprived the marketplace of potential competition. Professional sports teams or tournaments always have an interest in obtaining the best players possible. *Brown v. Pro Football, Inc.*, 518 U.S. 231 (1996). The record in this case indicates that the individual tennis tournaments traditionally compete for player talent. An agreement restricting this competition should not necessarily be immune from § 1 scrutiny merely because the tournaments cooperate in various aspects of producing the ATP Tour. "The justification for cooperation is not relevant to whether that cooperation is concerted or independent action." *Am. Needle*, 2010 WL 2025207, at *11. The necessity of cooperation does not "transform[] concerted action into independent action." *Id.* "The mere fact that the teams operate jointly in some sense does not mean that they are immune." *Id.*

But we need not decide whether the single enterprise instruction was given in error. As noted, even if the jury had found concerted action, the Federations' antitrust claims still fail because they did not satisfy their burden of proving a relevant market.[15]

---

[15]In *American Needle*, the Supreme Court emphasized that "teams that need to cooperate are not trapped by antitrust law," *id.* at *12, because "'[t]he special characteristics of this industry may provide a justification' for many kinds of agreements." *Id.* (quoting *Brown*, 518 U.S. at 252). "When 'restraints on

## IV.

## A.

In their complaint, the Federations asserted claims of breach of fiduciary duties of loyalty, due care, and good faith against six individual directors of ATP, all of whom voted in favor of the Brave New World plan. The District Court granted ATP's motion for judgment as a matter of law on these claims. The Federations appeal the judgment only in relation to their claim of breach of duty of loyalty by Director Charles Pasarell. Notably, they do not appeal the judgment in relation to their breach of fiduciary duty claims against the other five directors.

As noted, ATP is governed by a seven-member Board of Directors—three elected by tournament members, each representing a geographic region ("Tournament Representatives"), three elected by player members ("Player Representatives"), and a Chairman/President. Section 12.9 of ATP's Bylaws requires certain corporate actions to be approved by two affirmative votes of both the three Tournament

---

competition are essential if the product is to be available at all,' *per se* rules of illegality are inapplicable, and instead the restraint must be judged according to the flexible Rule of Reason." *Id*. (quoting *NCAA*, 468 U.S. at 101). As we explained *supra* Part II.C, given the circumstances of this case, the District Court correctly instructed the jury to evaluate the alleged restraints under the full rule of reason.

Representatives and the three Player Representatives. The Brave New World plan required such an approval. The European Tournament Representative, Zejlko Franulovic, voted against most provisions of the Brave New World plan, citing concerns about restrictions on competition. Accordingly, the votes of the other two Tournament Representatives were necessary for adoption of the Brave New World plan.

Director Pasarell served as a Tournament Representative from 1990. At the same time, he also was employed as Tournament Director of the Indian Wells Masters Series Event and held a 24% ownership in the Indian Wells tournament. Indian Wells is a tournament member of ATP. The Federations claimed that his vote in favor of the Brave New World plan constituted a breach of duty of loyalty because it was self-interested.

The District Court rejected the Federations' argument, concluding that they failed to rebut the business judgment rule presumption with sufficient evidence that Pasarell was materially self-interested in the Brave New World transaction. The District Court observed that although Pasarell, like other tournament owners, stood to benefit from any projected success of the Brave New World plan, Indian Wells was already among the most financially successful tournaments, and did not need the Brave New World plan to make money. Further, the court also held that the other directors were not materially self-interested and the Federations do not appeal that finding.

38

**B.**

Under Delaware law, the business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). Thus, "[t]he burden is on the party challenging the decision to establish facts rebutting the presumption." *Id.* The business judgment rule presumption can be rebutted by establishing "that the *board* was either interested in the outcome of the transaction or lacked the independence to consider objectively whether the transaction was in the best interest of its company and all of its shareholders." *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002).[16] "To establish that

---

[16] The presumption can also be rebutted by showing that "one or more directors less than a majority of those voting" suffers from a material and disabling interest and that "the interested director *controls or dominates* the board as a whole or [that] the interested director *fail[ed] to disclose his interest* in the transaction to the board *and* a reasonable board member would have regarded the existence of the material interest as a significant fact in the evaluation of the proposed transaction." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1168 (Del. 1995) ("*Technicolor III*") (alteration in original) (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1153 (Del.

a *board* was interested[,] . . . a plaintiff must allege facts as to the interest . . . of the *individual members* of that board." *Id*. Thus, a plaintiff must normally demonstrate "that a *majority* of the director defendants have a financial interest in the transaction . . . ." *Id.* (internal quotation marks and citation omitted); *see also Malpiede v. Townson*, 780 A.2d 1075, 1084–85 (Del. 2001) (concluding that the claim of breach of fiduciary duty of loyalty was insufficient because it alleged self-interest of only one director); *Brehm v. Eisner*, 746 A.2d 244, 257 (Del. 2000) (determining whether a majority of the board was disinterested and independent); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1168 (Del. 1995) ("*Technicolor III*") (affirming Court of Chancery determination that "if actual self-interest is present and affects a *majority of directors* approving a transaction, the entire fairness standard applies" (emphasis added)).

## C.

The Federations cannot prevail on their claim of breach of duty of loyalty because they failed to rebut the business judgment rule presumption. The District Court found that

Ch. 1994)); *see also In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 363 (Del. Ch. 2008). Because the Federations do not allege Pasarell controlled the ATP Board or failed to disclose his interest in Indian Wells, the only issue relevant to this appeal is whether the Board as a whole was interested and/or lacked independence. *See Orman*, 794 A.2d at 23.

Pasarell was not materially self-interested in his Brave New World vote. The Delaware Supreme Court has defined "interest" to "mean[] that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Aronson*, 473 A.2d at 812. "[I]n the absence of self-dealing, it is not enough to establish the interest of a director by alleging that he received *any* benefit not equally shared by the stockholders. Such benefit must be alleged to be *material* to that director."[17] *Orman*, 794 A.2d at 23 (citing *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 363 (Del. 1993), *modified*, 636 A.2d 956 ("*Technicolor II*")). "Materiality means that the

---

[17] The materiality requirement is not applicable to cases involving "classic self-dealing" where a director "stand[s] on both sides of a transaction." *HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 113–115 (Del. Ch. 1999). Although the Federations label Pasarell's vote as "self-dealing" instead of "self-interested," such characterization is misleading because Pasarell's Brave New World vote did not involve Indian Wells transacting with ATP. Pasarell's financial stake in Indian Wells was not "antithetic to the corporate interest in a . . . proposed course of action." 1 David A. Drexler et al., *Delaware Corporation Law and Practice* § 15.05[1]. The Federations allege that Pasarell received a special benefit. Thus, they must show materiality of the interest to rebut the business judgment rule presumption. *See generally id.*

41

alleged benefit was significant enough '*in the context of the director's economic circumstances, as* to have made it improbable that the director could perform her fiduciary duties to the . . . shareholders without being influenced by her overriding personal interest.'" *Id.* (omission in original) (quoting *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 617 (Del. Ch. 1999)). "In determining the sufficiency of factual allegations made by a plaintiff as to . . . a director's interest . . . the Delaware Supreme Court . . . requires the application of a subjective 'actual person' standard to determine whether a *particular* director's interest is material and debilitating . . . ." *Id.* at 24 (quoting *Technicolor III*, 663 A.2d at 1167).

Pasarell was not materially self-interested because he did not stand to obtain any unique benefits from the Brave New World plan. "A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993); *see also Aronson*, 473 A.2d at 812. The Brave New World plan was designed to benefit all the ATP top tier tournaments—Pasarell's supposed benefits from the Brave New World plan were not unique. Moreover, Pasarell's alleged interest could not be subjectively material because the evidence showed that Indian Wells was already doing well financially, attracting top tennis players before the Brave New World plan was adopted. Therefore, the alleged benefit was not "significant enough in the context of the

director's economic circumstances" to interfere with Pasarell's ability to perform his fiduciary duties "without being influenced by [his] overriding personal interest." *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d at 617. Because the Federations failed to show Pasarell was self-interested, his vote is entitled to the protection of the business judgment rule.[18]

---

[18]Further, regardless of whether Pasarell's vote was materially self-interested, to rebut the business judgment rule presumption, the Federations would need to show that the ATP Board was materially self-interested. But because the Federations do not now dispute that the remaining five directors, who voted for the Brave New World plan, were not materially self-interested, the disinterested directors made up the majority of the Board (six out of seven) and the majority of directors voting to approve the Brave New World plan (five out of six). Therefore, the Federations cannot establish that the majority of the ATP directors were materially self-interested. The Federations emphasize that the Brave New World plan could not have been adopted without Pasarell's vote. They argue that the disinterested majority rule should not apply here because the ATP Bylaws' "super-majority" voting provisions made simple majority approval insufficient to adopt the Brave New World plan.

Because we hold the District Court was correct in its finding that Pasarell was not self-interested, we do not need to decide how the super-majority voting provisions might affect the self-interest inquiry. However, we note that the Delaware

43

Supreme Court has previously addressed a similar issue. In *Technicolor III*, the corporation's certificate of incorporation included a provision which could be repealed with a recommendation made through a unanimous vote of qualified directors. 663 A.2d at 1170–71. The directors voted unanimously to recommend repealing the provision, but one of the directors was found to have been interested, and plaintiffs argued that the transaction was therefore voidable. The Delaware Supreme Court affirmed the Court of Chancery's conclusion that the unanimity provision in the charter "should not be construed to include an implied exclusion of interested directors from eligibility to participate in the unanimous vote." *Id.* at 1171. Similarly, Pasarell's necessary vote, even if materially interested, is not excluded by the super-majority provision of the ATP Bylaws. The provision states that "two affirmative votes of the Tournament Tour Board Representatives plus two affirmative votes of the Player Tour Board Representatives" are required. App. 2692 . Like the provisions in *Technicolor III*, the bylaws here do not require exclusion of the interested votes, and *Technicolor III* suggests that no such exclusion can be implied. But although in *Technicolor III* the board's actions were examined under the business judgment rule and found not to have breached the duty of loyalty, neither the Court of Chancery nor the Delaware Supreme Court explicitly stated that the super-majority voting requirement does not affect the applicability of the business

44

## V.

For these reasons, we will affirm the jury verdict for defendants on the Sherman Act § 1 claim, and the District Court's judgment as a matter of law for defendant Pasarell on the breach of fiduciary duty of loyalty claim.

---

judgment rule presumption. As noted, because Pasarell was not self-interested, we do not need to decide this issue.