PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 17-1990

LIFEWATCH SERVICES INC,

Appellant

v.

HIGHMARK INC; BLUE CROSS & BLUE
SHIELD ASSOCIATION; WELLPOINT INC;
HORIZON BLUE CROSS BLUE SHIELD
OF NEW JERSEY;BLUE CROSS & BLUE SHIELD OF
SOUTH CAROLINA; BLUE CROSS & BLUE SHIELD OF
MINNESOTA

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 2-12-cv-05146)
District Judge: Honorable Eduardo C. Robreno

Argued January 16, 2018

Before: AMBRO, RESTREPO, and FUENTES, <u>Circuit</u>
<u>Judges</u>

(Opinion filed: August 28, 2018)

Gary M. Elden, Esquire      (Argued)
Anna S. Knight, Esquire
Shook, Hardy & Bacon
111 South Wacker Drive, 51st Floor
Chicago, IL  60606

Michael J. McCarrie, Esquire
Artz McCarrie Health Law
1500 Market Street
Centre Square, West Tower, Suite 4100
Philadelphia, PA  19102

      Counsel for Appellant

Sheryl L. Axelrod, Esquire
The Axelrod Firm
The Beasley Builiding
1125 Walnut Street
Philadelphia, PA  19107

Sarah J. Donnell, Esquire
Daniel E. Laytin, Esquire    (Argued)
David J. Zott, Esquire
Kirkland & Ellis
300 North LaSalle Street, Suite 2400
Chicago, IL  60654

      Counsel for Appellee
      Blue Cross & Blue Shield Association

Justin W. Bernick, Esquire
John R. Robertson, Esquire
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Columbia Square
Washington, DC  20004

Stephen A. Loney, Jr., Esquire
Hogan Lovells US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA  19103

      Counsel for Appellees
      Wellpoint Inc.;
      Horizon Blue Cross Blue Shield of New Jersey,
      Blue Cross & Blue Shield of South Carolina;
      Blue Cross & Blue Shield of Minnesota

_____

OPINION OF THE COURT

_____

AMBRO, <u>Circuit Judge</u>

The seller of a medical device, believing it was shut out of the market for it, brought suit on federal antitrust grounds against associated health insurance companies. The claim was that they shielded themselves from patient demand for the seller's device by agreeing to deny coverage as "not medically necessary" or "investigational," even while the medical community, other insurers, and independent arbiters viewed it as befitting the standard of care. The District Court dismissed the claim. For the reasons that follow, we reverse its judgment and remand the case for further consideration.

## I.    Factual Background

We base our analysis, as we must on review of a Rule 12(b)(6) dismissal, on the allegations in the operative complaint—here the Third Amended Complaint (for convenience, the "Complaint"). According to it, cardiovascular disease and disorders are the leading cause of death in the United States. Plaintiff LifeWatch Services, Inc. ("LifeWatch") is one of the two largest sellers of telemetry monitors. They are one of several types of outpatient cardiac monitoring devices used to diagnose and treat arrhythmias, or changes in heart rate or rhythm, which may signal or lead to more serious medical complications. An arrhythmia can be without noticeable symptoms; hence the patient may not know it is occurring.

Other outpatient cardiac monitors include Holter monitors, various forms of event monitors, and insertable monitors. All record the electrical activity of a patient's heart to catch any instance of an arrhythmia. But they vary in price, method of data capture, and mechanism by which the data are transmitted to an analyst or physician for diagnosis. For example, telemetry monitors are about three times as expensive as event monitors. They record up to 30 days of a patient's cardiac activity and automatically transmit the data to an analyst center. Event monitors, by contrast, record short windows of data (in some cases no more than a minute), which the patient must then take some action to transmit. Many event monitors also require the patient to trigger the data capture, creating a risk that asymptomatic arrhythmias go undetected. Insertable monitors, which are surgically implanted and less frequently used, are the most expensive; they cost eight to ten times more than event monitors. While the Complaint quotes from medical studies that recommend only telemetry monitors to treat some patients with certain

conditions, in other cases telemetry and other monitors are all appropriate treatments.

LifeWatch brought suit against the Blue Cross Blue Shield Association (the "Association") and five of its member insurance plan administrators[1] (the "Blue Plans"; together with the Association, "Blue Cross") for violating Section 1 of the Sherman Act, 15 U.S.C. § 1. It claims the Blue Plans have impermissibly conspired with each other and the Association to deny coverage of telemetry monitors.

The Association, which is not an insurer itself, owns the rights to the Blue Cross and Blue Shield trademarks and trade names. It licenses the right to the Blue Cross brand to 36 insurers nationwide. These Blue Plans are allegedly the largest commercial health insurance group in the country, collectively insuring 105 million Americans, with a national network that covers 96% of hospitals and 92% of doctors. As

---

[1] The Defendant Blue Plans named in the Complaint are: Wellpoint, Inc., allegedly an Indiana corporation that, combined with its affiliates, serves more than 71 million people in California, Colorado, Connecticut, Georgia, Indiana, Kentucky, New York, Maine, Missouri, Nevada, New Hampshire, Ohio, Virginia, and Wisconsin, or more than a third of all privately insured Americans; Horizon Blue Cross Blue Shield of New Jersey, allegedly the largest health insurer in New Jersey; Blue Cross and Blue Shield of Minnesota, which allegedly has more members, products, and services than other insurers in that state; BlueCross BlueShield of South Carolina; and Highmark, Inc., allegedly one of the largest health insurers in the country serving, with affiliates, insureds in Pennsylvania, Delaware, and West Virginia. As described later, LifeWatch has since settled its case against Highmark.

a group, they are a major purchaser of medical devices and services nationwide.

The Association maintains a model medical policy that recommends to the Blue Plans which treatments, devices, or services to cover. Each Blue Plan participates in the development of these recommendations by voting on them. A panel of some kind—the Complaint is vague—then meets several times a year to finalize the model policy.[2]

For more than a decade the model policy has recommended against covering prescriptions for telemetry monitors, explaining that in some cases they are not "medically necessary" and in the rest they are "investigational." This provision of the model policy has been adopted in near lockstep[3] by the Association's member Blue Plans. Though the Plans' language denying coverage is not always identical, the reasoning is the same.

Meanwhile, Medicare, Medicaid, and other private insurers, including Aetna, cover telemetry monitor

_____

[2] LifeWatch's brief on appeal explains that the "Medical Policy Panel" is "the name Defendants give to themselves acting in concert." Appellant Br. 3. However, we see no basis in the pleadings on which to infer who or what the panel comprises.

[3] The Complaint references only two Blue Plans that ever contracted with LifeWatch to cover telemetry. One, a Plan in Illinois, settled with LifeWatch outside this lawsuit. As described later, the other, Highmark, partially changed course and stopped covering telemetry in some cases. The claims against Highmark were dismissed on June 9, 2016, after the parties reached a settlement.

6

prescriptions. Multiple medical studies—the Complaint references 10—have reviewed telemetry monitors and found them to be effective, superior to other treatments in some cases, or medically necessary. In at least 20 cases brought between 2010 and 2012 by patients appealing a denial of telemetry monitor coverage, independent, expert review boards overturned the insurers' denials; the review board frequently determined that telemetry monitors were a standard of care or clinically necessary. Blue Plans were parties to several, if not all, of those appeals.

Nonetheless, with near uniformity, and for a decade, the Blue Plans have declined to cover telemetry monitors. As a result, LifeWatch claims both its sales and cardiac monitoring treatment in general have suffered. It seeks treble damages for its losses and an injunction under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, which authorize private plaintiffs to sue for Sherman Act violations.

## II.    Analysis

Section 1 of the Sherman Act makes illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C. § 1. To state a Section 1 claim, then, a plaintiff must allege (1) an agreement (2) to restrain trade unreasonably. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010). A private plaintiff suing under the Clayton Act must also allege antitrust standing, including that its "injury [is] of the type the antitrust laws were intended to prevent and . . . flows from that which makes defendants' acts unlawful." *Id.* n.9. (quoting (*A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 247 (3d Cir.2001)). Finally, the claim in this case could still fail under the McCarran-Ferguson Act, 15

7

U.S.C. §§ 1011-1015, which exempts insurance providers from federal antitrust liability in certain instances.

The District Court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337. Blue Cross moved the Court to dismiss LifeWatch's Sherman Act Section 1 claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. It argued that the Complaint fails to allege either agreement or anticompetitive effects in the relevant product market, that LifeWatch lacks antitrust standing because it could not show antitrust injury, and that Blue Cross's telemetry monitor coverage decisions are immune from antitrust challenge under the McCarran-Ferguson Act.

The District Court dismissed for failing to allege anticompetitive effects, and therefore failing to establish the restraint was unreasonable. *LifeWatch Servs., Inc. v. Highmark, Inc.*, 248 F. Supp. 3d 641, 648-49 (E.D. Pa. 2017). The Court emphasized that, because "each Blue [P]lan treats all telemetry providers *equally*," LifeWatch failed to allege "competition-reducing" conduct. *Id.* at 649 (alteration and emphasis in original) (internal quotation marks omitted). It concluded that, "even assuming . . . a conspiracy amongst Blue Plans to deny coverage for telemetry devices, . . . this alleged conspiracy does not violate antitrust laws." *Id.* at 646. "[T]he Defendants' refusal—whether concerted or not—to purchase any telemetry device—whether produced by LifeWatch or not—is not an antitrust violation, but rather a legal exercise of Defendants' monopsony power."[4] *Id.* at 650.

---

[4] A monopoly exists if only "one supplier or producer" has "control or advantage . . . over the commercial market within a given region." *Black's Law Dictionary* 1160 (10th ed. 2014). If "one buyer controls the market" instead of a seller,

8

The Court also suggested in a *dictum* that LifeWatch failed to allege an agreement, as it believed the Plans could have independently decided "that the benefits of telemetry devices do not (yet) outweigh their costs." *Id.* at 649. It did not reach antitrust standing or the McCarran-Ferguson Act. *Id.* at 650.

LifeWatch timely appealed, and the same four issues are now before us for review. We have appellate jurisdiction under 28 U.S.C. § 1291. We exercise plenary review of dismissals under Rule 12(b)(6), "accept[ing] all factual allegations in the complaint as true and, examining for plausibility, 'determin[ing] whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 249 (3d Cir. 2017) (quoting *Bronowicz v. Allegheny County*, 804 F.3d 338, 344 (3d Cir. 2015)); *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220-21 (3d Cir. 2011).

For the reasons that follow, we hold that LifeWatch plausibly stated a claim and has antitrust standing. However, we leave Blue Cross's McCarran-Ferguson Act argument for the District Court's consideration on remand.

## A.    Agreement

We take in order the elements of a claim under Section 1. It prohibits "every contract, combination . . . , or conspiracy" that unreasonably restrains trade. 15 U.S.C. § 1. We have interpreted these three terms collectively simply to mean an agreement. *Ins. Brokerage*, 618 F.3d at 315.

---

that is a monopsony. *Id.* Likewise, if "a few large sellers" have "control or domination of a market," it is an oligopoly, while oligopsony is where "a few large buyers or customers" do. *Id.* at 1260.

"Unilateral activity by a defendant, no matter the motivation, cannot give rise to a [S]ection 1 violation." *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003). Instead, a plaintiff must plead "some form of concerted action . . . , in other words, a unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme . . . ." *Ins. Brokerage*, 618 F.3d at 315 (citations and internal quotation marks omitted).

An agreement may be shown by either direct or circumstantial evidence. *W. Penn Allegheny Health Sys., Inc. v. UPMC* ("*West Penn*"), 627 F.3d 85, 99 (3d Cir. 2010). LifeWatch asserts it has provided allegations of both. Because we hold it pled sufficient circumstantial evidence of agreement here, we do not reach its direct evidence theory.

As the Supreme Court explained in detail in *Bell Atlantic Corp. v. Twombly*, to survive a motion to dismiss, a plaintiff must plead "enough factual matter (taken as true) to suggest that an agreement was made." 550 U.S. 544, 556-57 (2007). "[A]n allegation of parallel conduct and a bare assertion of conspiracy," such as "a conclusory allegation of agreement at some unidentified point," will not suffice. *Id.* Rather, "allegations of parallel conduct . . . must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557.

For circumstantial evidence of an agreement, then, a plaintiff must allege both parallel conduct and something "more," which we have sometimes called a "plus factor." *Ins. Brokerage*, 618 F.3d at 321. This "more" could include evidence (1) "that the defendant had a motive to enter into a . . . conspiracy," (2) "that the defendant acted contrary to its interests," or (3) "implying a traditional conspiracy." *Id.* at 321-22 (quoting *In re Flat Glass Antitrust Litig.*, 385 F.3d

350, 360 (3d Cir. 2004)). In cases involving concentrated markets like oligopolies or oligopsonies—where a small number of sellers or buyers of a particular product dominate the market—we have recognized that competitors are more likely to be influenced by each other's behavior even without agreeing to act in concert. For example, "[o]ne oligopolist may refrain from lowering its price because it fears, indeed knows, that its rivals will match it." Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* ("*Fundamentals*") § 14.10[G] n.24 (4th ed. Supp. 2017). In those cases we de-emphasize the first two types of evidence, which "largely restate [that] phenomenon of interdependence," *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 193 (3d Cir. 2017) (quoting *Flat Glass*, 385 F.3d at 360), often called "conscious parallelism," *see id.* We focus instead on the third, *id.*, which is "'non-economic evidence "that there was an actual, manifest agreement . . . ,"' which may include 'proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown,'" *Ins. Brokerage*, 618 F.3d at 322 (quoting *Flat Glass*, 385 F.3d at 361).

LifeWatch pled parallel conduct. The Complaint quotes the provision in the Association's model policy that recommends the Blue Plans deny telemetry monitor coverage. It then asserts the Blue Plans adopted the model policy's approach with near total uniformity and references their use of similar or identical language to deny coverage of telemetry monitors.

Blue Cross proposes that we end our analysis here because the Complaint alleges, at best, no more than parallel conduct. In particular, Blue Cross cites the alleged higher price of telemetry monitors relative to event monitors (but

11

lower price relative to insertable monitors) as providing all the Plans an independent basis for denying coverage. Indeed, if LifeWatch had alleged *only* that the Association and the Plans reached the same telemetry monitor coverage decisions *en masse* multiple years in a row, and that telemetry monitors are more expensive than some other treatment options, Blue Cross might have the better argument. However, LifeWatch also pled something "more": evidence implying a traditional conspiracy.

As an initial matter, the Complaint states that the Association's model policy is set during meetings several times a year, where a panel reviews the votes of all Blue Plans regarding whether to cover particular treatments. As noted, this model policy, which the Blue Plans participate in creating, recommends denying coverage of telemetry monitors as either not medically necessary or investigational. Blue Cross does not dispute this description of the model policy or its creation. Instead, it argues that its member Plans are not bound to follow the model policy; in fact, it explicitly disclaims that notion in its text. Thus, according to Blue Cross, the Plans must make wholly independent decisions regarding which treatments are medically necessary.

This argument apparently misunderstands the nature of the alleged agreement, which is not contained within the model policy's text.[5] LifeWatch claims instead that the Blue

---

[5] As we have noted in the criminal conspiracy context, "common sense suggests, and experience confirms, that illegal agreements are rarely, if ever, reduced to writing or verbalized with the precision that is characteristic of a written contract." *United States v. McKee*, 506 F.3d 225, 238 (3d Cir. 2007).

12

Plans agreed with each other and the Association that they would *substantially comply with* the model policy. It dubs this agreement the "Uniformity Rule." The Association then allegedly enforces the Plans' conformance with the model policy through audits. If a Plan strays too far from the model, it could face sanctions, including losing the right to use the Blue Cross name.

Even if these allegations were too conclusory to tip the scales in favor of plausibility, the Complaint then provides a particular example of the Uniformity Rule's enforcement. Highmark initially contracted with LifeWatch to deem telemetry monitors medically necessary and cover prescriptions for them. Under that contract, Highmark covered claims for telemetry monitors submitted both by Highmark subscribers and by subscribers to other Blue Plans; those Blue Plans would then reimburse Highmark in some fashion. However, allegedly under pressure by the other Blue Plans and the Association, it stopped paying for claims from non-Highmark subscribers. As we and other courts have observed, "[c]oncerted action is established . . . [by] proof of a causal relationship between pressure from one conspirator and an anticompetitive decision of another conspirator."[6] *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005); *see also Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 397-99 (7th Cir. 1989).

That so many sophisticated third parties allegedly view telemetry monitors as medically necessary or meeting the standard of care further undercuts Blue Cross's theory that

---

[6] Although LifeWatch's claim against Highmark has been dismissed, it and other unsued Blue Plans remain alleged co-conspirators to the purported agreement. Thus their conduct can be evidence of the agreement's existence.

nearly three dozen Plans independently made the opposite determination for 10 consecutive years. As noted, according to the Complaint, other large insurers, including Aetna as well as Medicaid and Medicare, cover telemetry monitors as medically necessary. Multiple medical studies reached similar conclusions. In states that mandate independent, expert review of appeals of insurance coverage denials, LifeWatch also funded many costly patient appeals of telemetry monitor denials. It allegedly prevailed in an overwhelming number of cases; the Complaint identifies 20 successful appeals between 2010 and 2012 decided by at least six different independent review boards. The Complaint indicates that many, if not all, were appeals of a Blue Plan's denial. The review boards in several cases determined that telemetry monitors were clinically necessary or a standard of care.

Viewed in the light most favorable to LifeWatch, *see, e.g.*, *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 804 F.3d 633, 638 (3d Cir. 2015), these allegations make an agreement among the Defendants plausible. While a claim based on parallel—even consciously parallel—conduct alone would be insufficient to survive dismissal, *see Ins. Brokerage*, 618 F.3d at 321, the Complaint provides more. It alleges the type of agreement reached by the Blue Plans and the Association, an auditing mechanism by which the agreement is enforced, a particular time when a Blue Plan declined to cover telemetry monitors due to pressure from the Association and other Plans, and the improbability that the same coverage decision would be reached by nearly all the Blue Plans independently.[7] The agreement and enforcement

---

[7] The Complaint also gestures at a motive to conspire when it describes the Defendants' shared goal to save costs and increase profits by shifting demand to less expensive

14

mechanism pled here provide the "reasonably founded hope that the [discovery] process will reveal relevant evidence." *Twombly*, 550 U.S. at 559; *see also Ins. Brokerage*, 618 F.3d at 324.

## B.       Unreasonable Restraint of Trade

To state a Section 1 claim, LifeWatch must also plead that Blue Cross's agreement has unreasonably restrained trade. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998) ("[T]he Sherman Act's prohibition of '[e]very' agreement in 'restraint of trade' . . . prohibits only agreements that *unreasonably* restrain trade." (emphasis in original) (citation omitted)). An "unreasonable" restraint is one that inhibits competition in the relevant market. *Eichorn v. AT & T Corp.*, 248 F.3d 131, 138 (3d Cir. 2001).

A restraint among competitors—called "horizontal," as opposed to "vertical" restraints on market participants at different points in a product's supply chain—is more rigorously scrutinized for an antitrust violation because it could more easily facilitate competitive harms, such as the exclusion of rivals, price fixing, or the consolidation of market power. *See* Areeda & Hovenkamp, *Fundamentals*, *supra*, § 14.11[A]. In particular, "when a firm exercises monopsony power pursuant to a conspiracy, its conduct is

treatment options. However, in our case law the mere desire to shift demand to lower cost devices is not a plus factor establishing an agreement without further evidence "of concerted, collusive conduct." *Burtch*, 662 F.3d at 229 (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 137 (3d Cir. 1999)). "In a free capitalistic society, all entrepreneurs have a legitimate understandable motive to increase profits." *Id.* (same).

15

subject to more rigorous scrutiny . . . ." *West Penn*, 627 F.3d at 103. "[U]nlike independent action, concerted activity inherently is fraught with anticompetitive risk insofar as it deprives the marketplace of independent centers of decisionmaking that competition assumes and demands." *Id.* (internal quotation marks omitted). Indeed, some horizontal restraints, including price fixing and market division, are considered anticompetitive by their very nature. *NYNEX Corp.*, 525 U.S. at 133-34 (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (horizontal price-fixing), and *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990) (per curiam) (horizontal market division)). These are treated as *per se* Sherman Act Section 1 violations. *Id.*

However, many horizontal restraints are not so clearly harmful to competition. *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 829-30 (3d Cir. 2010). Instead, or in addition, they may, for example, facilitate the creation of new products, improve efficiencies, or lead to lower consumer costs. A restraint that is not *per se* unreasonable is analyzed under some form[8] of a "rule of reason" burden-shifting

---

[8] Some horizontal restraints may warrant only a "quick look," rather than a complete rule-of-reason analysis. *See F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986); *see also Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 n.7 (2018). A quick look "presum[es] competitive harm without detailed market analysis" because "the anticompetitive effects on markets and consumers are obvious." *Deutscher Tennis Bund*, 610 F.3d at 832. It is inappropriate if "'the contours of the market' . . . are not 'sufficiently well-known or defined to permit the court to ascertain without the aid of extensive market analysis whether the challenged practice impairs competition . . . .'" *Id.* (quoting *Worldwide Basketball &*

16

framework, which seeks to determine whether the restraint's harmful effects are outweighed by any procompetitive justifications and, if so, whether there are less restrictive alternatives. *Id.*; *see also United States v. Brown Univ.*, 5 F.3d 658, 678-79 (3d Cir. 1993).

LifeWatch claims the Blue Plans are engaged in a horizontal, concerted refusal to deal. The parties agree that this conduct should be analyzed under the rule of reason framework.[9] Thus LifeWatch can satisfy the unreasonable-restraint element in two ways. It can plead "'actual detrimental effects [on competition],' . . . such as reduced output, increased prices, or decreased quality in the relevant market." *Am. Express Co.*, 138 S. Ct. at 2284 (quoting *Ind. Fed'n of Dentists*, 476 U.S. at 460). Alternatively, it can plead that the Blue Cross Defendants have "market power[,] plus some evidence that the challenged restraint harms competition." *Id.* Under either approach, "courts usually cannot properly apply the rule of reason without an accurate definition of the relevant market" because, in most cases, a court must "conduct a fact-specific assessment of 'market power and market structure . . . to assess the [restraint]'s

---

*Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n.*, 388 F.3d 955, 961 (6th Cir. 2004)).

[9] We note that some group boycotts, which are similar to concerted refusals to deal, are treated as unlawful *per se*. *Ind. Fed'n of Dentists*, 476 U.S. at 458. But "the category of restraints classed as group boycotts is not to be expanded indiscriminately, and the *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor," *id.*, which LifeWatch does not allege here.

actual effect' on competition." *Id.* at 2284-85 (alteration in original) (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984)).

The parties do not dispute that LifeWatch must allege a relevant market in this case. We thus begin with those allegations, which provide the context for both its assertions of anticompetitive effects and the District Court's rationale in granting Blue Cross's motion to dismiss.

### 1.    Market Definition

The relevant market in a Section 1 case is "the area of effective competition . . . within which significant substitution in consumption or production occurs." *Am. Express Co.*, 138 S. Ct. at 2285 (internal quotation marks omitted). In other words, "the outer boundaries of a relevant market are determined by reasonable interchangeability of use" of a particular product within a particular geographic area. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437, 442 (3d Cir. 1997). In addition to substitutability or interchangeability, "[w]e also look to . . . cross-elasticity of demand, which is defined as '[a] relationship between two products, usually substitutes for each other, in which a price change for one product affects the price of the other.'" *Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 435-36 (3d Cir. 2016) (quoting *Black's Law Dictionary* 458 (10th ed. 2014)).

Critically, in a buyer-side conspiracy case, seller rather than consumer or purchaser behavior is the focus. *Todd v. Exxon Corp.*, 275 F.3d 191, 2012 (2d Cir. 2001) (Sotomayor, J.) (citing Roger D. Blair & Jeffrey L. Harrison, *Antitrust Policy and Monopsony*, 76 Cornell L. Rev. 297, 324 (1991)). "[The] market is comprised of buyers who are seen by sellers as being reasonably good substitutes." *Campfield v. State*

*Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008) (quoting *Todd*, 275 F.3d at 202). Thus a court should be wary of applying the market-definition analysis for seller-side conspiracies "mechanically in the context of monopsony or oligopsony." *Todd*, 275 F.3d at 202.

A complaint may be properly dismissed if it defines the relevant market without reference to interchangeability or cross-elasticity of demand or if it "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor . . . ." *Queen City Pizza*, 124 F.3d at 436. However, absent such obvious oversights, courts are cautious before dismissing for failure to define a relevant market. *See Todd*, 275 F.3d at 199-200 (collecting cases). Ultimately the relevant market must "both correspond to the commercial realities of the industry and be economically significant." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336-37 (1962) (internal quotation omitted). That is why, "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers" or purchasers, in seller-side conspiracies, or sellers, in buyer-side conspiracies. *Queen City Pizza*, 124 F.3d at 436; *see also Todd*, 275 F.3d at 199-200 ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market."). Our case deals with the latter: commercial realities faced by medical device sellers seeking purchases. For example, these might be direct, out-of-pocket purchases by the end-user patients, patient purchases funded by a health insurer intermediary, or patient purchases reimbursed by a health insurer after the fact.

A plaintiff bears the burden of defining both a relevant geographic and a relevant product market. The Complaint asserts several relevant markets here: national and regional

19

markets for the sale of health insurance plans and a national market for the purchase of outpatient cardiac monitors. However, LifeWatch forfeited its insurance-market theories by not fully briefing them on appeal. Fed. R. App. P. 28(a)(8)(A); *Barna v. Bd. of Sch. Directors of Panther Valley Sch. Dist.*, 877 F.3d 136, 145 (3d Cir. 2017). When pressed during oral argument, it then explicitly waived them. We therefore turn to the only market definition still before us: the national outpatient cardiac monitor market.

The parties do not dispute that the alleged market is national, and the Complaint alleges commercial realities to support a nationwide market. Patients nationwide suffer arrhythmias that may require treatment with cardiac monitors. Telemetry device firms and other unspecified monitoring-device firms allegedly sell their products nationwide. Insurers on the buyer side that allegedly compensate sellers of cardiac monitors also operate nationally, including Medicaid and Medicare. The Association's model policy recommending that Blue Plans not pay for telemetry monitors is distributed nationally to each Blue Plan. And, as noted, the Blue Plans operating across the country allegedly cover 105 million Americans collectively, purportedly about half of all Americans with private insurance.

However, the parties vigorously dispute whether LifeWatch has pled a relevant product market. The focus of the parties' briefing on appeal is whether telemetry monitors compete with other types of monitors. According to LifeWatch, *all* outpatient cardiac monitor sellers compete within the same market. The Complaint repeatedly references an "outpatient cardiac monitor" market and describes the four categories of monitors that compete within it: telemetry, Holter, event, and insertable monitors.

20

Although its opinion does not say so outright, the District Court seemingly rejected that market when it dismissed LifeWatch's claim. It reasoned that the Blue Plans' alleged refusal to purchase telemetry monitors had no anticompetitive effects *among telemetry monitor providers* because it treated them all equally. *See LifeWatch Servs.*, 248 F. Supp. 3d at 649. Blue Cross argues the District Court implicitly, and correctly, held that LifeWatch's claimed product market was implausible and therefore adopted a telemetry-monitor-only market for purposes of its anticompetitive-effects analysis.

Read in the light most favorable to LifeWatch, however, the Complaint alleges competition among all outpatient cardiac monitors such that they are plausibly within the same product market. All four of the alleged categories of monitors capture the same type of data from a patient's heart. They capture it for the same purpose: to identify and treat cardiac arrhythmias. The principal harm LifeWatch alleges is that Blue Cross is shifting demand to other outpatient cardiac monitors—presumably conduct that would be impossible if the monitors were not interchangeable to some relevant degree. Indeed, LifeWatch claims many doctors have given up prescribing telemetry monitors and instead rely exclusively on other cardiac monitors to treat their patients. The Complaint also quotes a medical study by the American Heart Association recommending telemetry monitors alongside other cardiac monitors to treat certain conditions.

Undoubtedly the Complaint alleges that certain monitors are less able to function in some areas than others, while others are costlier. It describes telemetry monitors as superior to Holter and event monitors in their ease of use, greater data capture, and ability to diagnose infrequent or incapacitating arrhythmias. It asserts that only telemetry

monitors ought to be prescribed for patients with certain conditions.

Blue Cross argues these allegations are fatal to LifeWatch's claim because they establish that telemetry monitors are not reasonably interchangeable with other cardiac monitors. But differentiation is often present among competing products in the same market. For example, as we have long observed, different brands of cars may compete to provide a consumer's main transportation to and from work— and, depending on the circumstances, they may also compete with other modes of travel. *Queen City Pizza*, 124 F.3d at 437. "Many machines performing the same function—such as copiers, computers, or automobiles—differ not only in brand name but also in performance, physical appearance, size, capacity, cost, price, reliability, ease of use, service, customer support, and other features." Areeda & Hovenkamp, *Fundamentals*, *supra*, § 5.11[A]. "Nevertheless, they generally compete with one another sufficiently that the price of one brand is greatly constrained by the price of others." *Id.*

Beyond the question of competition among cardiac monitors, however, there is apparently a more fundamental problem with the District Court's reasoning and Blue Cross's arguments on appeal. The underlying question driving the unreasonable-restraint analysis in a buyer-side conspiracy case is whether the defendants' *purchasing power* is constrained by competition from other purchasers in the relevant market. Thus, from the perspective of a seller, the interchangeability that matters is for *purchasers* of outpatient cardiac monitors.

Once again, as LifeWatch argues, the Complaint alleges sufficient facts to survive a motion to dismiss. It notes that sellers of medical devices like LifeWatch "are often

small and highly dependent on a limited number of products," suggesting they cannot easily change their products or expand their offerings to induce a disinterested buyer to purchase from them.[10] Third Am. Compl. ¶ 63. It also plausibly alleges that health insurers are gatekeepers controlling patient purchases in the market. According to the Complaint, it is exceedingly rare for a patient to pay for a medical device out of pocket. It describes in detail the difficulties patients face in obtaining outpatient cardiac monitors not covered by their insurers, including the opaque, costly appeals process for coverage denials and that patients are often locked into whatever health plan their employer sponsors. Thus it is fair to infer that individual consumers do not constrain the Blue Plans' ability to control purchases or purchase prices. The Complaint acknowledges that other insurers like Aetna, Medicaid, and Medicare also fund patient purchases of outpatient cardiac monitors. It also describes the prohibitively high entry barriers to the health insurance business. According to these allegations, only established insurers effectively control purchases of outpatient cardiac monitors.

---

[10] We note that LifeWatch allegedly began offering a lower-priced "Elite" monitor after Highmark's decision to stop covering telemetry monitors in part. However, the Complaint suggests that the Elite product still costs LifeWatch the same amount to make and that it operates at less-than-optimal performance, as it is a standard telemetry monitor with some functions either not provided or disabled. LifeWatch's Elite monitor allegations illustrate that medical device sellers may not be able to change their inventories readily in response to changing buyer preferences. No allegations support a contrary inference.

In this context, we conclude the Complaint plausibly states that the Blue Plans compete with other insurers, but not individual consumers, in a national market for the purchase of outpatient cardiac monitors.

## 2. Anticompetitive Effects

Armed with the proper market definition, the unreasonable-restraint analysis becomes straightforward. The Complaint alleges various "actual anticompetitive effects," which, as noted, could include "reduction of output, increase in price, or deterioration in quality of goods and services." *Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*, 833 F.3d 399, 403 (3d Cir. 2016) (quoting *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 276 (3d Cir. 1999)).

According to the Complaint, the Blue Plans refuse to pay for telemetry monitors "not as a result of independent decisionmaking, but pursuant to a conspiracy" with each other and the Association. *See West Penn*, 627 F.3d at 104. We have held in similar cases that it is "certainly plausible" for this sort of agreement to "unreasonably restrain[] trade." *Id.* "Such shortchanging poses competitive threats similar to those posed by conspiracies among buyers to fix prices . . . and other restraints that result in artificially depressed payments to suppliers—namely, suboptimal output, reduced quality, allocative inefficiencies, and (given the reductions in output) higher prices for consumers in the long run." *Id.* (citation omitted).

Indeed, these are the anticompetitive effects LifeWatch claims. According to the Complaint, Blue Cross's concerted denial of telemetry monitor coverage has harmed consumers by reducing demand for and output of more effective devices, by interfering with a patient's choice of medical treatment, and by reducing the quality of cardiac monitors in general.

24

LifeWatch alleges the restraint artificially shifts demand from telemetry monitors to lower quality substitutes. It discourages physicians and their patients from choosing the most appropriate treatment. Further, physicians, who typically do not know which insurance a patient has, are allegedly deterred from prescribing telemetry monitors altogether, even if it is the preferred treatment for patients whose insurance would cover it. They simply prescribe a cardiac monitor that will certainly be covered, rather than risk discovering later that the patient cannot afford a telemetry monitor. And because the restraint reduces current and anticipated demand for telemetry monitors in favor of older technology, it hinders research, development, and innovation in the market for cardiac monitors.

The District Court's reasoning that there can be no anticompetitive effects from a restraint that treats all sellers of telemetry monitors equally rests on a telemetry-monitor-only product market that was not alleged. A concerted refusal to deal with all sellers of telemetry monitors, regardless of its equality, may still restrain competition in the alleged market for the purchase of outpatient cardiac monitors.

The District Court also attempted to distinguish this case from *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982). But with our understanding of the alleged product market, those distinctions disappear. In *McCready*, a plaintiff patient denied coverage for psychological treatment brought a class action against Blue Shield health insurance companies and a group of psychiatrists for allegedly agreeing "to exclude and boycott clinical psychologists from receiving compensation under the Blue Shield plans." 457 U.S. at 470. In analyzing whether the patient's injury was of a type the antitrust laws were intended to prevent, the Supreme Court described the alleged agreement as an "anticompetitive scheme." *Id.* at 483. "Blue Shield sought to induce its

25

subscribers into selecting psychiatrists over psychologists" by "refusing to reimburse subscribers for psychotherapy performed by psychologists, while providing reimbursement for comparable treatment by psychiatrists." *Id.* at 467, 483-84. A subscriber presented with this alleged "Hobson's choice . . . between visiting a psychologist and forfeiting reimbursement, or receiving reimbursement by forgoing treatment by the practitioner of their choice" was injured by "that which makes the defendants' acts unlawful"—*i.e.*, by their anticompetitive effects. *Id.* at 484.

Similarly, LifeWatch claims that the Blue Plans induce doctors and insureds to use other outpatient cardiac monitors instead of telemetry monitors by refusing to fund telemetry monitor prescriptions while funding comparable treatment with other monitors. *See id.* at 483-84. The District Court suggested there can be no "Hobson's choice" as in *McCready* where the Blue plans "do not cover *any* telemetry device supplied by *any* provider." *LifeWatch Servs.*, 248 F. Supp. 3d at 648. But the "Hobson's choice" here is not among telemetry monitor brands but among all cardiac monitors—just as in *McCready* the choice was not among psychologists but among all psychotherapy providers.

Because LifeWatch has alleged actual anticompetitive effects in the relevant market, the unreasonable restraint element of the Section 1 claim is satisfied directly. We thus need not consider whether LifeWatch also satisfied it indirectly by alleging Blue Cross's market power over the purchase of outpatient cardiac monitors. *See Am. Express Co.*, 138 S. Ct. at 2284.

## C.     Antitrust Standing

In the preceding analysis we concluded that LifeWatch pled a Section 1 violation. However, its claim could

26

nonetheless fail if it lacks antitrust standing to bring suit under the Clayton Act.

Sections 4 and 16 of the Clayton Act enable private plaintiffs to sue for treble damages for and to enjoin antitrust injuries. 15 U.S.C. §§ 15, 26. While the statutory language of those provisions is broad, and apparently requires only constitutional standing to bring suit,[11] the Supreme Court has held that private plaintiffs must also have "antitrust standing." *See Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 171 (3d Cir. 2015). The Court articulated several factors to consider when analyzing whether a plaintiff has such standing. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 538 (1983). We have summarized these factors as:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended

---

[11] Standing is a term for "[a] party's right to make a legal claim or seek judicial enforcement of a duty or right." *Black's Law Dictionary* 1625 (10th ed. 2014). Constitutional standing derives from Article III of the U.S. Constitution, which limits the federal court's "judicial power," or jurisdiction, to deciding "cases" or "controversies." U.S. Const. art. III, § 2; *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). For a federal court to have jurisdiction over any claim, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id*. at 1547.

27

to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165-66 (3d Cir. 1993).

The parties here dispute only whether LifeWatch alleged the second factor, antitrust injury, which "is a necessary but insufficient condition of antitrust standing." *Hanover 3201 Realty*, 806 F.3d at 171. It seeks to ensure that the antitrust laws are enforced to protect competition and not individual competitors. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488 (1977). An antitrust injury (1) "flows from that which makes [the] defendants' acts unlawful" and (2) "is an injury of the type the antitrust laws were intended to prevent." *West Penn*, 627 F.3d at 101 (quoting *Brunswick Corp.*, 429 U.S. at 489).

To analyze the first prong of antitrust injury, "we must examine the causal connection between the purportedly unlawful conduct and the injury." *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 265 (3d Cir. 1998). Blue Cross argues that intervening factors, such as the Plan's independent ability to decline coverage of telemetry monitors, a doctor's choice not to prescribe telemetry monitors, and a patient's desire for alternative treatments, "'cut[] the causal chain' and convert any claim of causation into 'a speculative exercise.'" Appellee Br. 32 (quoting *City of Pittsburgh*, 147 F.3d at 267-68).

28

We find this causation argument unpersuasive. The Complaint asserts that the Plans' near universal decision to deny coverage of telemetry monitors would not occur without enforcement of the Uniformity Rule—as evidenced by other insurers' coverage, independent arbitrators' decisions that they should be covered, and scientific studies finding them effective and in some circumstances preferable. It also alleges that doctors are deterred from prescribing telemetry monitors because of the Blue Plans' decision not to cover them and the hassle caused by not knowing whether a patient's insurer will deny coverage. And it alleges that the Uniformity Rule insulates the Plans from demand for telemetry treatment. This sufficiently pleads a causal link between LifeWatch's injury—lost profits from depressed telemetry monitor sales—and the Plans' denial of telemetry monitor coverage due to the Uniformity Rule. *See McCready*, 457 U.S. at 480-81, 483 (noting providers, in addition to consumers, of a medical treatment would have a claim for "Blue Shield's selective refusal to reimburse" (internal quotation marks omitted)); *cf. City of Pittsburgh*, 147 F.3d 267 (finding no causal link where plaintiff's injury was due to regulations preventing competition between defendant utility companies, not the defendants' proposed merger).

Likewise, LifeWatch's alleged injury due to anticompetitive effects in the outpatient cardiac monitor market is "of the type" the antitrust laws were meant to prevent. "As a general matter, the class of plaintiffs capable of satisfying the antitrust-injury requirement is limited to consumers and competitors in the restrained market . . . and to those whose injuries are the means by which the defendants seek to achieve their anticompetitive ends." *West Penn*, 627 F.3d at 102 (internal citations omitted). Denying coverage for LifeWatch's telemetry device was the means by which the Blue Plans and the Association depressed demand for

telemetry monitors in the outpatient cardiac monitor market. Its ability to compete as a seller of outpatient cardiac monitors has been allegedly hindered by the Uniformity Rule. *See McCready*, 457 U.S. at 483-84 (noting where insureds "were compelled to choose" between a covered treatment provider and one for whom Blue Shield denied coverage, the denied treatment provider also had antitrust injury). Its injury "reflect[s] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *West Penn*, 627 F.3d at 101 (quoting *Brunswick Corp.*, 429 U.S. at 489).

Blue Cross counters that no competition-reducing conduct was alleged because all telemetry monitor providers are treated equally; therefore LifeWatch's injury is not "of the type" the antitrust laws seek to prevent. Of course, this only reiterates the District Court's implicit product market analysis with which we have already disagreed.

In sum, LifeWatch sufficiently pled both elements of antitrust injury, and its antitrust standing is not otherwise in dispute.

### D.     McCarran-Ferguson Act

Finally, LifeWatch's claim can only survive Blue Cross's motion to dismiss if the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, does not exempt Blue Cross from antitrust liability. As Blue Cross acknowledged at oral argument, a defendant bears the burden of establishing its immunity under that Act. *See Doctors, Inc. v. Blue Cross of Greater Phila.*, 490 F.2d 48, 50 n.2 (3d Cir. 1973) ("The motions to dismiss were filed before either defendant submitted an answer. As a result, the essential facts necessary to support this claim of immunity have not as yet been pleaded."); *Grp. Life & Health Ins. Co. v. Royal Drug*

*Co.*, 440 U.S. 205, 216 (1979) (analyzing the Act's exemption according to what the defendants demonstrated).

On the heels of a Supreme Court ruling that "insurance transactions were subject to federal regulation under the Commerce Clause, and that the antitrust laws in particular, were applicable to them," Congress passed the McCarran-Ferguson Act to clarify that regulation of the "business of insurance" should be relegated to the states. *Sec. & Exch. Comm'n v. Nat'l Sec., Inc.*, 393 U.S. 453, 458 (1969). However, the Act provides that the Sherman Act still applies to "the business of insurance to the extent that such business is not regulated by State Law" and to "agreement[s] to boycott, coerce, or intimidate." 15 U.S.C. §§ 1012(b), 1013(b). Therefore, for Blue Cross to be exempted from liability in this case, its challenged conduct "(1) must constitute the business of insurance, (2) must be regulated by state law, and (3) must not amount to a boycott, coercion, or intimidation." *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 124 (1982). The parties agree that Blue Cross has satisfied the third element but dispute whether it can satisfy the first two.

Because it dismissed on other grounds, the District Court did not address whether Blue Cross has shown it is exempt. We do not decide the issue and leave it for the Court's consideration on remand.

### III.    Conclusion

LifeWatch plausibly pled an agreement between the Blue Plans and the Association that unreasonably restrains trade in the national market for outpatient cardiac monitors. It pled that its injury stems from the competitive harms caused by this agreement. Thus LifeWatch has stated a Sherman Act Section 1 claim.

Blue Cross nonetheless may be exempt from liability under the McCarran-Ferguson Act, a question the District Court did not reach in its opinion. We therefore reverse its dismissal and remand for it to consider Blue Cross's McCarran-Ferguson Act argument.