NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 18-2316

———————————

CABLE LINE, INC.; MCLAUGHLIN COMMUNICATIONS, INC.,

Appellants

v.

COMCAST CABLE COMMUNICATIONS OF PENNSYLVANIA, INC.;
DECISIVE COMMUNICATIONS;
VITEL COMMUNICATIONS, a Subsidiary of JNET Communications, LLC

———————————

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 3-16-cv-01000)
District Judge: Honorable Robert D. Mariani

———————————

Argued March 8, 2019

Before: AMBRO, RESTREPO, and GREENBERG, Circuit Judges

(Opinion filed April 19, 2019)

———————————

OPINION*

———————————

AMBRO, Circuit Judge

———————————

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

Cable Line, Inc., and McLaughlin Communications, Inc., were companies that installed coaxial cable, fiber-optic cable, and related devices in the homes and businesses of broadband internet customers in and around Pennsylvania.  They claim that defendant-appellees Comcast Cable Communications, Decisive Communications, and Vitel Communications drove them out of business, in violation of state and federal antitrust laws, by forming a conspiracy to restrain trade in the market for cable installation in parts of the mid-Atlantic area.  They also claim that Comcast discriminated against them based on their race in the selection of its cable installation subcontractors in violation of 42 U.S.C. § 1981.  The District Court dismissed the federal claims on the pleadings and declined jurisdiction over the state claims.  We affirm.

## I.    Background

We take the facts from plaintiffs' Complaint as true and construe them in the light most favorable to them, drawing all inferences in their favor.  *See Vorchheimer v. Phila. Owners Ass'n*, 903 F.3d 100, 105 (3d Cir. 2018).

Before going out of business, Cable Line and McLaughlin were cable installation companies that worked primarily for Comcast, the dominant provider of internet service in the mid-Atlantic area.  In 2009 Comcast launched a nationwide "subcontractor reduction" plan with the goal to reduce its cable installation suppliers.  As part of that plan, Comcast administered a request for proposal (RFP) process "to determine the lowest amount that Comcast could pay Plaintiffs and the other cable installation companies."

During this process, a Comcast representative suggested that Cable Line and McLaughlin should "ramp up" their operations, which they understood to mean they had competed "successfully" in the RFP process. Both Cable Line and McLaughlin did so by investing in new warehouse facilities, purchasing new vehicles, and hiring and training new technicians.

Neither Cable Line nor McLaughlin received a long-term contract from Comcast at the end of the RFP process. Instead Comcast selected co-defendants Decisive and Vitel—two competing cable installation companies—to serve as Comcast's exclusive cable installers in Comcast's "Freedom," "Beltway," and "Keystone" regions (the "Regions"), which cover Pennsylvania, Washington, D.C., and parts of Virginia, Maryland and Delaware. Plaintiffs' businesses suffered when Comcast chose Decisive and Vitel as its exclusive cable installers in the Regions. More broadly, Comcast reduced its cable installation suppliers from 176 in 2009 to just 39 in 2012.

Plaintiffs allege several theories for why Comcast reduced the number of its cable installers and chose Decisive and Vitel as its exclusive installers in the Regions. They say Comcast wanted to induce consolidation in the cable installation market to increase its margins in that market, realign capital and human resources in the cable installation market by inducing companies like plaintiffs to "ramp up" investment and then foreclosing them from the market, choose the lowest-cost cable installers in Decisive and Vitel, choose the subcontractors with the best performance metrics even though it knew those metrics were manipulated, choose subcontractors who were willing to help Comcast defraud shareholders by under-reporting service follow-up calls, and increase

3

the percentage of its subcontractors that are owned by "diverse" individuals, such as Vitel, which is an African-American owned company.

Based on these allegations, the Complaint asserts one claim against all defendants under Section 1 of the Sherman Act, 15 U.S.C. § 1, analogous claims under state antitrust laws, and one claim against Comcast under 42 U.S.C. § 1981 for discrimination based on race. The District Court dismissed both federal claims and declined to assert supplemental jurisdiction over the state claims. It held the antitrust claim failed because plaintiffs did not adequately allege (1) antitrust injury, (2) conspiracy, and (3) anticompetitive effects. It held the discrimination claim failed because, although plaintiffs pointed to a race-based selection criterion in Comcast's computer system, their other allegations undermine the theory that Comcast chose Vitel based on race.

## II.    Discussion

### A. Antitrust Claim

To state a claim under Section 1 of the Sherman Act, "a plaintiff must allege (1) an agreement (2) to restrain trade unreasonably." *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 331 (3d Cir. 2018). A private plaintiff must also allege (3) "antitrust standing" by showing its "injury is of the type the antitrust laws were intended to prevent and . . . flows from that which makes defendants' acts unlawful." *Id.* (quotation and alterations omitted).

According to plaintiffs, the Complaint alleges either an unlawful monopsony or an unlawful hub-and-spoke conspiracy. We address each theory in turn.

4

A "monopsony" exists when a market is controlled by one buyer. *See Lifewatch*, 902 F.3d at 332 n.4. Put another way, monopsony power is "market power on the buy side of the market." *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007). In limited circumstances, a showing of wrongful conduct by a monopsonist can result in antitrust liability. *See id.* at 314. To plead a monopsony claim, a plaintiff must allege monopsony power and conduct by the monopsonist that excludes its rivals—*i.e.*, other buyers in the same market. *See id.* at 322 n.3. Ordinarily, a monopsony claim is brought under Section 2 of the Sherman Act because it is a form of monopoly, which is the domain of Section 2. *See id.*[1] The monopsony theory of plaintiffs' claim could be denied on that ground alone: they invoked Section 2 for the first time in their reply brief on appeal. (Pls.' Reply Br. at 1.)

Even if we considered the merits of plaintiffs' monopsony theory, we would not sustain it. Plaintiffs acknowledge that Comcast is not the only buyer of cable installation services in the Regions. Notwithstanding that concession, the Complaint does not allege any facts concerning those other companies and how, if at all, Comcast unlawfully excluded them from the market for cable installation. Absent those allegations, the Complaint does not adequately allege the relevant market, which is fatal to their claim. *See Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991). At bottom, plaintiffs ask us to impose antitrust "monopsony" liability merely because a purchaser

---

[1] Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

with market power in a vaguely defined market decided to reduce the number of its suppliers. They do not point to any authority for extending antitrust liability so broadly, and our role is not to imagine that extension for them.

A "hub-and-spoke" conspiracy "involves a hub, generally the dominant purchaser or supplier in the relevant market, and the spokes, made up of the distributors involved in the conspiracy. The rim of the wheel is the connecting agreements among the horizontal competitors (distributors) that form the spokes." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010). Plaintiffs contend that Comcast, Decisive, and Vitel formed a hub-and-spoke conspiracy to restrain trade in the cable installation market for the Regions, but their own allegations defeat that claim. The Complaint not only does not allege facts to infer an agreement between Decisive and Vitel, it directly acknowledges that they did not know Comcast was aiming to induce consolidation in the cable installation market until Comcast completed its RFP process: "Regional installation companies like Defendants Vitel and Decisive *subsequently* became aware of Comcast's strategy, the end goal of the elimination of installation companies, and their role in absorbing competitors' assets." (Compl. ¶ 123 (emphasis added).) We thus join the District Court in concluding that plaintiffs have not adequately alleged the agreement element of a hub-and-spoke conspiracy. Accordingly, we need not address the other elements of Section 1 for plaintiffs' hub-and-spoke theory.

Prior to oral argument, we asked the parties to be prepared to address whether plaintiffs' antitrust claim should be viewed through the lens of tying and exclusive dealing, as in the Supreme Court's decision in *Jefferson Parish Hospital District No. 2 v.*

6

*Hyde*, 466 U.S. 2 (1984).[2]  In that case, a hospital agreed by contract to use an exclusive anesthesiology firm to provide a service (anesthesiology) that was tied to a service the hospital provided (surgeries).  *See id.* at 6–7.  Rival suppliers who were excluded (other anesthesiologists) sued under Section 1 of the Sherman Act, but their claim failed because they did not show the hospital had power in the market for surgeries.  *See id.* at 28–29.  There could perhaps be a parallel between *Jefferson Parish* and this case, but plaintiffs did not allege a tying theory in their Complaint or pursue a *Jefferson Parish* analogy in the District Court or here, so we conclude that theory is not fairly before us. We thus express no view on whether an antitrust claim could be made against Comcast based on allegations that it extracts monopoly-like margins in the cable installation market by using exclusive cable installers and tying their service to a service over which it may have monopoly power (cable service).

### B.  Discrimination Claim

In addition to their antitrust claims, Plaintiffs allege that Comcast violated 42 U.S.C. § 1981 by choosing Vitel as an exclusive cable installer because it is an African-American-owned business.  They do not allege that Decisive received any similar preference.  The District Court dismissed the claim because the Complaint, as a whole, failed to allege facts allowing a plausible inference that Comcast chose Vitel based on a

---

[2] "A tying arrangement may be defined as an agreement by a party to sell one product or service but only on the condition that the buyer also purchases a different (or tied) product or service, or at least agrees that he will not purchase that product or service from any other supplier." *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 397 (3d Cir. 2016).  An exclusive dealing arrangement is an "agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time." *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 403 (3d Cir. 2016).

racial preference.  In their opening brief, plaintiffs devote less than a page to their § 1981 claim, fail to state the applicable legal standard, and cite neither the Complaint as to this issue nor any legal authority.  They do not mention the claim in their reply brief.  Comcast asserts that plaintiffs waived the claim on appeal by failing to present argument and authority to support it.  We agree.  *See Norman v. Elkin*, 860 F.3d 111, 129 (3d Cir. 2017).

*       *       *       *       *

We thus affirm the District Court's dismissal of the Complaint.